Peter KACHANIS, Plaintiff,

v.

UNITED STATES of America, Amica Mutual Insurance Company, The Rhode Island Insurers' Insolvency Fund, and Guaranty Fund Management Services, Defendant.

Civ. A. No. 92–0487 P.

United States District Court,
D. Rhode Island.

Feb. 8, 1994.

Aram R. Schefrin, Lovett, Schefrin, Gallogly & Harnett, Providence, RI, for plaintiff.

Stephanie S. Browne, U.S. Atty's Office, Thomas C. Angelone, Hodosh, Spinella & Angelone, Providence, RI, Sally A. Vanderweele, Hutchins, Wheeler & Dittmar, Boston, MA, for defendant.

### MEMORANDUM AND ORDER

PETTINE, Senior District Judge.

Plaintiff Peter Kachanis brought this declaratory judgment action under 28 U.S.C. § 2201 (1988) to determine the respective rights and liabilities of defendants under the Federal Employees' Compensation Act, 5 U.S.C. §§ 8101 *et seq* (1988) ("FECA") and the Rhode Island Insurers' Insolvency Fund Act, R.I.Gen.Laws §§ 27–34–1 *et seq.* (1993) ("Insolvency Act"). Cross–motions for summary judgment were filed. The Magistrate–Judge recommended granting the motion of defendants Rhode Island Insurers' Insolvency Fund and Guaranty Fund Management Services (collectively "the Fund") and denying the motions of Mr. Kachanis and the United States of America. Magistrate–Judge's Report and Recommendation at 18 ("Report and Recommendation"). Mr. Kachanis and the United States filed objections to the Magistrate–Judge's report. For the reasons set forth below, I grant the Fund's motion for summary judgment and deny the motions of the United States and Mr. Kachanis.[1]

### I. *Factual and Statutory Background*

The underlying facts are not in dispute. In January 1986, Mr. Kachanis was a resident of Rhode Island and an employee of the United States Internal Revenue Service. While in the course of his employment, Mr. Kachanis was involved in a motor vehicle accident with Lisbeth Woloohojian on January 27, 1986. At the time of the accident, Mr. Kachanis had an automobile insurance policy with Amica Mutual Insurance Compa-

---

1. The Fund's motion is granted with one exception. As to the definition of "unpaid" claim, explained *infra* at 886–887, I grant the motion of Mr. Kachanis and deny the motion of the Fund.

ny ("Amica"), including coverage for uninsured motorist benefits in the amount of $50,000. Ms. Woloohojian was insured by American Universal Insurance Company ("AU") with a policy provided limit of $500,000.

At this point, a brief overview of the relevant statutes would be instructive. The purpose of the Rhode Island Insurers' Insolvency Fund Act is "to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer, and to create an entity to assess the cost of such protection and distribute it equitably among member insurers." R.I.Gen.Laws § 27–34–2 (1993).[2] Under the statute, all member insurers must pay into a fund as a requirement of transacting business in the state of Rhode Island.[3] When an insurer becomes insolvent, the Fund takes over the obligations of that insurer and pays up to $300,000 on each "covered claim." *Id.* at § 27–34–8(1)(a)(iii). A "covered claim" does not include any subrogation claim due any insurer, reinsurer, insurance pool, or underwriting association. *Id.* at § 27–34–5(8)(b)(iii). Before receiving any recovery from the Fund, a claimant is required to exhaust all other available coverage under any other applicable insurance policy, governmental insurance, or guaranty program. *Id.* at § 27–34–12. The Fund then reduces the amount payable on a covered claim by the amount received from other sources. *Id.*

FECA was enacted to provide federal employees with a comprehensive system of recovery for work related injuries. "The United States shall pay compensation . . . for the disability or death of an employee resulting from personal injury sustained while in the performance of his duty." 5 U.S.C. § 8102(a). An employee may be required to reimburse the government for the FECA benefits. This reimbursement obligation arises when the federal employee's injuries are caused by a third party who is liable for damages. *Id.* at § 8132. Once the employee obtains recovery from the third party, she must reimburse the United States to the extent of that recovery. *Id.* Under section 8131, the United States has a subrogation right to any recovery received from the third party and may require the employee to assign the right of action to the United States or prosecute the action in her own name. *Id.* at § 8131(a).[4]

With this statutory framework in mind, the remaining facts can be more easily understood. After the accident, Mr. Kachanis began receiving medical and salary benefits from the United States Department of Labor pursuant to FECA. Mr. Kachanis also filed a claim for damages against AU, Ms. Woloohojian's insurer. However, subsequent to the accident, AU was determined to be insolvent. Thus, under the Insolvency Act, the Fund became obligated to pay the claims against AU. Mr. Kachanis' insurer, Amica, offered to pay its policy limit of $50,000 which Mr. Kachanis accepted. The United States agreed to waive any lien it may have as to such payment and Amica was dismissed as a defendant with the consent of all parties. Report and Recommendation at 4.

The key question, reduced to its simplest form, is whether the Fund is required to pay

---

2. *See Metropolitan Property and Casualty Ins. Co. v. Rhode Island Ins. Insolvency Fund,* 811 F.Supp. 54 (D.R.I.1993) (holding that the Insolvency Act did not violate the federal Constitution).

3. "There is hereby created a nonprofit unincorporated legal entity to be known as the Rhode Island insurers' insolvency fund. All insurers defined as member insurers shall be and remain members of the fund as a condition of their authority to transact insurance in this state." R.I.Gen.Laws § 27–34–6. "Member insurer" is defined as follows: " 'Member insurer' means any person licensed to transact in this state any kind of contracts or policies to which this chapter applies." *Id.* at § 27–34.1–5(g).

4. The relevant part of section 8131 is set forth below.

§ 8131 Subrogation of the United States

(a) If an injury or death for which compensation is payable under this subchapter is caused under circumstances creating a legal liability on a person other than the United States to pay damages, the Secretary of labor may require the beneficiary to—

(1) assign to the United States any right of action he may have to enforce the liability or any right he may have to share in money or other property received in satisfaction of that liability; or

(2) prosecute the action in his own name.

Mr. Kachanis (who would then reimburse the United States) *or* whether the Fund is entitled to deduct from its liability limit the FECA benefits already paid to Mr. Kachanis. The United States has asserted a lien to any recovery Mr. Kachanis may receive from AU and/or the Fund. In support of its position, the United States argues that FECA preempts the Insolvency Act pursuant to the Supremacy Clause and that the United States' lien is part of Mr. Kachanis' claim so that the Fund must make full payment up to its maximum limit. The Fund, however, contends that the Insolvency Act is not preempted, that the lien of the United States is not part of Mr. Kachanis' claim and that the Fund may reduce any payment to Mr. Kachanis by the amounts received from the United States and Amica.

This matter is before the court on cross-motions for summary judgment. Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). To survive a motion for summary judgment, the non-moving party must establish that there is a genuine issue of material fact. *Matsushita Elec. Industrial Co. v. Zenith Radio*, 475 U.S. 574, 585, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Here, all parties have stipulated that there is no dispute as to any material facts. Report and Recommendation at 6. Therefore, the issues before me are pure questions of law.

## II. *Federal Preemption*

The threshold issue which must be decided is the question of federal preemption.

Under the Supremacy Clause, U.S. Const., Art. VI, cl. 2, the enforcement of a state regulation may be preempted by federal law in several circumstances: first, when Congress, in enacting a federal statute, has expressed a clear intent to pre-empt state law; second, when it is clear, despite the absence of explicit preemptive language,

that Congress has intended, by legislating comprehensively, to occupy an entire field of regulation and has thereby 'left no room for the States to supplement' federal law; and, finally, when compliance with both state and federal law is impossible, or when the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 698–99, 104 S.Ct. 2694, 2699–2701, 81 L.Ed.2d 580 (1984) (citations omitted). While the above-mentioned tests are applicable to all state laws, Congress has passed specific legislation concerning preemption of state laws in the area of insurance.

"No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any state for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b) (1988). This statute, known as the McCarran–Ferguson Act, was enacted in response to *United States v. South–Eastern Underwriters Ass'n*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944). *See United States Dep't of Treasury v. Fabe*, —— U.S. ——, ——, 113 S.Ct. 2202, 2207, 124 L.Ed.2d 449 (1993) (discussing the history of the McCarran–Ferguson Act). The *South–Eastern* decision held that "an insurance company that conducted a substantial part of its business across state lines was engaged in interstate commerce and thereby was subject to the antitrust laws." *Fabe*, 113 S.Ct. at 2207. The decision was "widely perceived as a threat to state power to tax and regulate the insurance industry." *Id.* Congress enacted the McCarran–Ferguson Act to allay those fears.

Courts have created a three-part test to determine if the McCarran–Ferguson Act is applicable to a given situation. *Cochran v. Paco, Inc.*, 606 F.2d 460, 464 (5th Cir.1979); *First Nat'l Bank of Pennsylvania v. James Sedgwick of Minnesota*, 792 F.Supp. 409, 417 (W.D.Pa.1992); *Duane v. Gov't Employees Ins. Co.*, 784 F.Supp. 1209, 1220 (D.Md.1992). The initial question is whether the federal act, FECA in this case, "specifically relates to the business of insurance" within the meaning of section 1012(b). *Cochran*, 606

F.2d at 464; *First Nat'l Bank,* 792 F.Supp. at 418. If the answer to this question is yes, then the McCarran–Ferguson Act is inapplicable by its own terms. If, however, FECA does *not* specifically relate to the business of insurance, then I must decide whether the Insolvency Act was "enacted for the purpose of regulating the business of insurance." *Cochran,* 606 F.2d at 464. If the Insolvency Act was not enacted for such a purpose, then the McCarran–Ferguson Act is, once more, inapplicable. If the Insolvency Act was enacted for such a purpose, then I must turn to the final question of whether FECA would "invalidate, impair, or supersede state law." *Id.*

The Magistrate–Judge found that the McCarran–Ferguson Act is applicable. Report and Recommendation at 13. Defendant Fund, of course, argues that the Magistrate–Judge's holding is correct and should be affirmed. Mr. Kachanis and the United States argue that the Magistrate–Judge misapplied the relevant test, that the Insolvency Act directly conflicts with FECA, and that the Insolvency Act does not "regulate the business of insurance."

## A) DEFINITION OF "BUSINESS OF INSURANCE"

The McCarran–Ferguson Act uses the phrase "business of insurance" three times within section 2(b).

> "No Act of Congress shall be construed to invalidate, impair, or supersede any law *enacted for the business of insurance,* or which imposes a fee or tax upon such business, unless such Act *specifically relates to the business of insurance:* Provided, That after June 30, 1948, the . . . Sherman Act, . . . the Clayton Act, and the . . . Federal Trade Commission Act . . . shall be applicable to the *business of insurance* to the extent that such business is not regulated by State law."

15 U.S.C. § 1012(b) (emphasis added). Throughout the years, the Supreme Court has continued to refine the definition of this phrase. In *Securities & Exchange Comm'n v. National Securities, Inc.,* 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), the Court stated that the McCarran–Ferguson Act "did not purport to make the states supreme in regulating all the activities of insurance *companies;* its language refers not to the persons or companies who are subject to state regulation, but to laws 'regulating the *business* of insurance.' " *Id.* at 458, 89 S.Ct. at 567. Further, the "clear" focus of the Act was "the relationship between the insurance company and the policyholder." *Id.* at 460, 89 S.Ct. at 568. "Statutes aimed at protecting or regulating this relationship, directly or indirectly, are laws regulating the 'business of insurance,' within the meaning of the phrase." *Id.*

In a later case, the Supreme Court established a three-part test to determine if a particular practice is part of the "business of insurance." *Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 129, 102 S.Ct. 3002, 3008, 73 L.Ed.2d 647 (1982). The Court listed the following criteria: (1) whether the practice has the effect of transferring or spreading a policyholder's risk; (2) whether the practice is an integral part of the policy relationship between the insurer and the insured; and (3) whether the practice is limited to entities within the insurance industry. *Id.* In *Fabe,* the Court's most recent case, after referring back to the *National Securities* definition, the Court applied the *Pireno* three-part test. The Court pointed out that the first clause of section 2(b) of the McCarran–Ferguson Act (the clause at issue in the present case) is "not so narrowly circumscribed" as the antitrust exemption in the second clause. *Id.,* —— U.S. at ——, 113 S.Ct. at 2209.

> [T]he language of § 2(b) is unambiguous: the first clause commits laws "enacted . . . for the purpose of regulating the business of insurance" to the States, while the second clause exempts only "the business of insurance" itself from the antitrust laws. To equate laws "enacted . . . for the purpose of regulating the business of insurance" with the "business of insurance" itself . . . would be to read words out of the statute. This we refuse to do.

*Id.,* 113 S.Ct. at 2209–2210 (footnote omitted). Thus, while the *Fabe* decision discussed and applied the *Pireno* three-part test, it is clear that the interpretation of "the

business of insurance" is broader in a situation which does not involve the antitrust exemption. *See Garcia v. Island Program Designer, Inc.,* 4 F.3d 57 (1st Cir.1993) (applying *Fabe* in a non-antitrust context).

The relevant case law refers only to "the business of insurance" in the context of the state law or practice; that is, whether the state law was enacted for the business of insurance or whether the antitrust exemption is applicable. None of the cases discussed the phrase as it applies to the determination of whether a federal statute is "specifically related to the business of insurance." However, I believe the definition set forth in *Fabe* can be applied to the issue before me: whether FECA is "specifically related to the business of insurance."

## B) FECA AS RELATED TO THE BUSINESS OF INSURANCE

■ "The conception underlying work[er]'s compensation is one of insurance, in particular ... of accident, industrial, occupational, occupational disease, or social insurance." 99 C.J.S. *Workmen's Compensation* § 9 at 54 (1958) (footnotes omitted). "It was not the purpose of the workmen's compensation act that the employer should in all respects be an insurer of the employee. The employer is an insurer only for those accidental injuries caused or produced in some way by the employment." *Madison v. Key Work Clothes, Inc.,* 182 Kan. 186, 318 P.2d 991 (1957). *See also Mixon v. Lovett,* 122 Ga.App. 517, 177 S.E.2d 826, 828 (1970) ("compensation under the Workmen's Compensation Act is similar in character to benefits under an insurance policy"). Generally, under state workers' compensation statutes, "[b]efore an employer may begin operations, the employer must secure insurance that meets certain legal requirements. Through this insurance, the employer is required to pay the cost of all work related injuries suffered by its employees regardless of fault." *Smith v. American Express Travel–*

*Related Services,* 765 F.Supp. 1061, 1063 (D.Utah 1991).

FECA was enacted in 1916 as the first injury-compensation statute for federal employees. *United States v. Lorenzetti,* 467 U.S. 167, 176, 104 S.Ct. 2284, 2290, 81 L.Ed.2d 134 (1984); *Ostrowski v. Roman Catholic Archdiocese of Detroit,* 479 F.Supp. 200, 205 (E.D.Mich.1979) ("FECA is a workers' compensation statute for federal employees"), *aff'd,* 653 F.2d 229 (6th Cir.1981); 99 C.J.S. *Workmen's Compensation* § 5 at 48 (1958) (purpose of FECA is to provide a comprehensive compensation system for federal employees). Each agency is required to pay into an "Employees' Compensation Fund." 5 U.S.C. § 8147. Each agency is required to pay into the Fund. Certain agencies must include requests for benefits from the Fund in annual budget requests; other agencies must make deposits into the Fund.[5] The Fund is then "available without time limit for the payment of compensation and other benefits and expenses." *Id.* at § 8147(a).

The parties have not cited, nor has my independent research uncovered, any cases discussing whether FECA falls within the ambit of the McCarran–Ferguson Act. Applying the tests set out above, it is apparent that FECA is not specifically related to the business of insurance. First, while FECA does provide insurance-like benefits to employees, there is no specific mention of insurance in the statute. *See Hanover Ins. Co. v. Commissioner of Internal Revenue,* 598 F.2d 1211, 1218 (1st Cir.) (Internal Revenue Code "specifically relates to the business of insurance" where it deals exclusively with taxation of insurance companies), *cert. denied,* 444 U.S. 915, 100 S.Ct. 229, 62 L.Ed.2d 169 (1979); *Bernstein v. Centaur Ins. Co.,* 606 F.Supp. 98, 101 (S.D.N.Y.1984) (where Federal Arbitration Act does not specifically address the business of insurance, court assumed that the Act was not excluded from the McCarran–Ferguson Act). Nor is there

---

**5.** Each agency and instrumentality shall include in its annual budget estimates for the fiscal year beginning in the next calendar year a request for an appropriation in an amount equal to the costs.... An agency or instrumentality not dependent on an annual appro-

priation shall make the deposit required by this subsection from funds under its control during the first fifteen days of October following the furnishing of the statement.

5 U.S.C. § 8147(b).

any indication within FECA of an implied repeal of the McCarran–Ferguson Act. Second, the first two prongs of the *Pireno* test focus on the relationship between the policyholder and the insurer: whether the practice has the effect of transferring or spreading a policyholder's risk and whether the practice is an integral part of the policy relationship between the insurer and the insured. *Pireno,* 458 U.S. at 129, 102 S.Ct. at 3008. In a workers' compensation situation, the policyholder is generally the employer and the insurer is the entity providing workers' compensation for that employer. In the case of FECA, the United States does not enter into a relationship with another entity to provide insurance but rather provides any money due under FECA itself. Further, the federal employee does not enter into an insurance policy but instead receives benefits under a federal statute. It is unclear whether a federal employee could be considered a policyholder under a workers' compensation statute. Because there is no insurance policy at issue in a FECA situation, there is not necessarily any transference of risk. Thus, FECA, as judged under the first two prongs of the *Pireno* test, does not preempt the Insolvency Act. Finally, the last prong of *Pireno*—whether the law is limited to entities within the insurance industry—also weighs against preemption as FECA does not apply to the insurance industry.[6]

I therefore hold that FECA is not specifically related to the business of insurance and the McCarran–Ferguson Act applies. I must now turn to the question of whether the Insolvency Act is a law "enacted for the purposes of regulating the business of insurance."[7]

## C) THE INSOLVENCY ACT AS THE REGULATION OF THE BUSINESS OF INSURANCE

■ The second prong of the McCarran–Ferguson Act requires a determination of whether the state law at issue "was enacted for the purpose of regulating the business of insurance." *Cochran,* 606 F.2d at 464. The Magistrate–Judge, applying *Pireno* and *Fabe,* found that the Insolvency Act was enacted for the purpose of regulating the business of insurance. Report and Recommendation at 12.

> The purpose of the statute is specifically stated as an avoidance of financial loss to claimants and policyholders. In other words, actual performance of the insurance contract is sought and the statute satisfies the three-part *Pireno* test. As the *Fabe* Court stated, 'the actual performance of an insurance contract is an essential part of the "business of insurance.'"

*Id.* (citations omitted). The United States argues, in a somewhat contradictory fashion, that the Insolvency Act does not meet the third prong of the *Pireno* test *and* that the *Fabe* decision altered the *Pireno* test.

In *Fabe,* the Supreme Court addressed the interaction of federal and state statutes which created priorities for the payments of claims from an insolvent insurer. The Ohio statute attempted to place the claims of the United States in fifth priority while the federal statute required that claims of the United States be paid first. The Court was called upon to determine whether the Ohio priority statute was "enacted for the purpose of regulating the business of insurance."

---

6. It is possible that although FECA does not *regulate* the business of insurance, FECA itself is insurance. As discussed above, insurance is the underlying concept of FECA. *Supra* at 882. Further, at least one commentator has listed FECA as one of the "areas of federal government involvement in insurance." 19 John A. Appleman and Jean Appleman, *Insurance Law and Practice* § 10323 n. 1 (1993) (citing Alliance of American Insurers, *Regulation of Insurance* (Dec. 1977)). Indeed, the Fund concedes that "the United States acts as a self-insurer under FECA's workers' compensation program." Opposition of [the Fund] to [Kachanis and United States] Objections to the Report and Recommendation

of the United States Magistrate Judge at 19. However, I am not at liberty to cast aside Supreme Court precedent. Thus, under *Pireno,* FECA does not regulate the business of insurance.

7. Mr. Kachanis and the United States argue, as a separate ground for preemption, that the Insolvency Act is in direct conflict with FECA and is therefore preempted under the Supremacy Clause. However, the McCarran–Ferguson Act controls preemption analysis in all cases concerning state insurance laws and thus, a "direct conflict" analysis is not applicable here.

There can be no doubt that the actual performance of an insurance contract falls within the "business of insurance," as we understood that phrase in *Pireno* and *Royal Drug*. To hold otherwise would be mere formalism. The Court's statement in *Pireno* that the "transfer of risk from insured to insurer is effected by means of the contract between the parties ... and ... is complete at the time that the contract is entered," presumes that the insurance contract in fact will be enforced. Without performance of the terms of the insurance policy, there is no risk transfer at all. Moreover, performance of an insurance contract also satisfies the remaining prongs of the *Pireno* test: it is central to the policy relationship between insurer and insured and is confined entirely to entities within the insurance industry. The Ohio priority statute is designed to carry out the enforcement of insurance contracts by ensuring the payment of policyholders' claims despite the insurance company's intervening bankruptcy. Because it is integrally related to the performance of insurance contracts after bankruptcy, Ohio's law is one "enacted by the States for the purpose of regulating the business of insurance."

*Fabe,* —— U.S. at ——, 113 S.Ct. at 2209 (citations omitted). Thus, the question is whether the Insolvency Act "is integrally related to the performance of insurance contracts after bankruptcy." *Id.*

> The purpose of [the Insolvency Act] is to provide a mechanism for the payment of covered claims under certain insurance policies to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer, and to create an entity to assess the cost of such protection and distribute it equitably among member insurers.

R.I.Gen.Laws § 27–34–2. The entity created by the Insolvency Act is a guaranty association. "Guaranty associations are non-profit organizations created by state statute for the purpose of rapidly paying policyholder and third-party claims against an insolvent insurer's estate. They consist of and are funded

by solvent insurers authorized to transact business in the forum." Davis J. Howard, *Uncle Sam Versus The Insurance Commissioners: A Multi–Level Approach to Defining the "Business of Insurance" Under the McCarran–Ferguson Act,* 25 Willamette L.Rev. 1, 14–15 (1989) (advocating a multi-tiered approach to the definition of the "business of insurance"). The author argues that the definition of "business of insurance" set forth in *National Securities* opinion "*should* encompass the activities of liquidators and guaranty associations because one of their principal functions is to adjust claims and pay for covered losses to the extent funds are available and statutory caps are not exceeded." *Id.* at 42.

The United States argues that *Fabe* set forth a new test and therefore altered the *Pireno* test. As discussed in the previous section, *Fabe* applied the three prong test of *Pireno*. It is therefore apparent that the Insolvency Act "is enacted 'for the purpose of regulating the business of insurance' to the extent that it serves to ensure that, if possible, policyholders ultimately will receive payment on their claims. That the policyholder has become a creditor and the insurer a debtor is not relevant." *Fabe,* —— U.S. at ——, 113 S.Ct. at 2210.

As its second argument, the United States argues that the Insolvency Act fails the third prong of the *Pireno* test—whether the state statute impacts on entities outside of the insurance industry.

> Clearly, the United States is not an entity within the insurance industry. By treating the federal government in the same fashion as an insurance company doing business in the state of Rhode Island, the Recommendation takes the state statute out of the regulation of the business of insurance and outside the protection of McCarran–Ferguson.

Def. United States of America's Objection to the Report and Recommendation of the United States Magistrate Judge at 3. In essence, the government argues that the Fund cannot have it both ways—either FECA specifically relates to the business of insurance or it does not. If it does, the McCarran–Ferguson Act does not apply. If FECA does *not* relate to

insurance, then the Insolvency Act impacts entities outside the insurance industry. In response, the Fund argues that "this Court should declare that in the context of FECA payments the United States is an insurer." Mem. of [Fund] in Opp'n to Pl. Peter Kachanis and Def. United States of America's Objection to the Report and Recommendation of the United States Magistrate Judge (hereinafter "Opp'n of Fund") at 17. Thus, according to the Fund, while FECA does not specifically relate to the business of insurance, the United States is an insurer under FECA.

I agree with the United States that it seems blatantly contradictory to hold that FECA is not specifically related to the business of insurance on one hand and to hold that the United States is an entity within the insurance industry (the third prong of *Pireno*) on the other. The same contradiction existed in *Fabe:* the federal priority statute did not "specifically relate to the business of insurance" and the Ohio statute satisfied *Pireno* even though it applied to the United States. The Court never discussed this contradiction. Instead, the Court characterized the state statute as one which is " 'aimed at protecting or regulating' the performance of an insurance contract." *Fabe,* —— U.S. at ——, 113 S.Ct. at 2210. The Court then, without discussion, held that the "performance of an insurance contract also satisfies the remaining prongs of the *Pireno* test: ... [it] is confined entirely to entities within the insurance industry." *Id.,* 113 S.Ct. at 2209. Thus, although the Ohio statute in *Fabe* explicitly applied to the United States, the *Fabe* court found that it meet the third prong of the *Pireno* test.

Although the Insolvency Act is not identical to the Ohio statute, both were "designed to carry out the enforcement of insurance contracts by ensuring the payment of policyholders' claims despite the insurance company's intervening bankruptcy." *Id.* As such, *Fabe* is controlling and I must therefore hold that the Insolvency Act was enacted for purposes of regulating the business of insurance.

8. "The majority of guaranty fund statutes are variations of model acts promulgated by the NAIC beginning in 1969." Howard, *Uncle Same Versus the Insurance Commissioners, supra* at 14.

## D) INVALIDATE, IMPAIR OR SUPERSEDE

Under the test set forth in *Cochran,* the final step is whether FECA would "invalidate, impair or supersede" the Insolvency Act. However, I need not reach this question. The McCarran–Ferguson Act states "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any state for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b). Thus, by its very terms, invalidation must be considered only if the federal statute "specifically relates to the business of insurance." Since I have previously held that FECA does not specifically relate to the business of insurance, my analysis under the McCarran–Ferguson Act is complete.

█ In summary, under the McCarran–Ferguson Act and the relevant Supreme Court decisions, where FECA and the Insolvency Act conflict, FECA must give way.

## III. *Obligations of the Fund*

I first note that there are no Rhode Island state court decisions interpreting the Insolvency Act. However, 48 other states have insolvent insurer acts, many with identical language to the Rhode Island act.[8] While decisions interpreting those other state acts are obviously not binding upon this court, I will turn to them for guidance.

The Insolvency Act "provide[s] a mechanism for the payment of covered claims." R.I.Gen.Laws § 27–34–2. " 'Covered claim' means an unpaid claim, including one for unearned premiums, submitted by a claimant ... 'Covered claim' shall not include any amount: ... Due any reinsurer, insurer, insurance pool, or underwriting association, as subrogation recoveries or otherwise." *Id.* at § 27–34–5(8). The Insolvency Act also contains a nonduplication of recovery clause.

"There are comparable insolvency fund statutes in all of the other forty-nine states (except New York)." Opp'n of Fund at 6.

**27–34–12. Nonduplication of recovery.**—(1) Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall be required to exhaust first his or her right under such policy. Any amount payable on a covered claim under this chapter shall be reduced by the amount of any recovery under such insurance policy.

(2) Any person having a claim or legal right of recovery under any governmental insurance or guaranty program which is also a covered claim, shall be required to exhaust first his or her right under such program. Any amount payable on a covered claim under this chapter shall be reduced by the amount of any recovery under such program.

*Id.* at § 27–34–12.

The Fund argues that under these definitions, any payment to Mr. Kachanis to which the United States has a subrogation right is precluded. Further, according to the Fund, to the extent Mr. Kachanis has received payment from Amica and FECA, his claim is not "unpaid" and therefore does not qualify as a covered claim. Finally, the Fund argues that it is entitled to reduce its obligation to Mr. Kachanis by the amounts paid by Amica and the United States under FECA.

## A) DEFINITION OF "UNPAID"

█ The Magistrate–Judge found that "[u]npaid means 'not yet paid.' *The American Heritage Dictionary*, 3d Edition, 1992. Clearly, the Kachanis claim has been paid to the extent Kachanis has received FECA benefits and the Amica insurance payment." Report and Recommendation at 16. Mr. Kachanis argues that the Insolvency Act is ambiguous.

The court has ruled that the amount paid by USA and Amica to plaintiff is "paid", therefore those amounts are not within the

definition of a "covered claim" under the statute. If those amounts are not part of plaintiff's "covered claim" then the FUND should not get a credit/deduction in that amount. . . . The [Magistrate–Judge's] decision determined that the plaintiff's claim was "paid" as to the amounts received from USA and Amica. Therefore the amounts paid by USA and Amica are excluded from the amount of plaintiff's "covered claim."

Pl.'s Mem. of Law in Support of His Objection to [Magistrate–Judge's] Report and Recommendation at 3. I quite agree with Mr. Kachanis. If the amounts from the United States and Amica are excluded from his "covered claim" because they are paid and then, under the nonduplication clause, the same amounts are deducted from his "covered claim," the Fund will in effect receive double credit for the payments of the United States and Amica.

A Washington state court addressed the very same issue in *Washington Ins. Guaranty Ass'n v. Mullins*, 62 Wash.App. 878, 816 P.2d 61 (1991). In *Mullins*, the issue was whether the Washington Insurance Guaranty Association (WIGA) could deduct payments that Mullins received under a state benefits program. The WIGA argued that because the claimant was compensated under the state benefits program, "his claim is not 'unpaid' and is not a 'covered claim.'" *Id.* at 64. The Washington statute contained the same definition of "covered claim" as the Rhode Island Insolvency Act.[9] "[A] 'covered claim' is one which arises under an insurance policy and has not been paid by the insurance company due to its insolvency. Under our Act, 'unpaid' is not limited to those cases where the claimant has received no funds from any source." *Id.* In reaching this interpretation, the *Mullins* court discussed the very ambiguity set forth by Mr. Kachanis. "If a claim is not 'covered' to the extent it has been paid

---

9. Under the Washington statute, a covered claim is:

> an unpaid claim, including one for unearned premiums, which arises out of and is within the coverage of an insurance policy to which this chapter applies issued by an insurer . . . "Covered claim" shall not include any amount

> due any reinsurer, insurer, insurance pool, or underwriting association, as subrogation recoveries or otherwise . . .

*Washington Ins. Guaranty Ass'n v. Mullins*, 62 Wash.App. 878, 816 P.2d 61, 63 (1991) (citations omitted).

by another source ... then there would be no need for the provision in the statute reducing the 'amount payable on a covered claim' by the amount recovered under another insurance policy." *Id.* at 64–65.

Other courts have reached an opposite result when considering the same issue. "[I]t does not seem to us that a claim, to the extent it has already been compensated from some other source, is an unpaid claim. In order to qualify as a 'covered claim' under the statute, a claim must be unpaid." *Ferrari v. Toto,* 9 Mass.App.Ct. 483, 402 N.E.2d 107, 109 (1980), *aff'd in relevant part,* 383 Mass. 36, 417 N.E.2d 427 (1981). *See also Florida Ins. Guaranty Ass'n v. Dolan,* 355 So.2d 141, 142 (Fla.App.1978).

I find the reasoning of the *Mullins* court to be more persuasive. The Fund should not be allowed a double deduction for payments made under an insurance policy. The Fund may, however, deduct such payments under the nonduplication of recovery clause. For instance, assume that Mr. Kachanis has a claim of $50,000 and has received $10,000 in payments from other insurers. Under the Fund's interpretation, Mr. Kachanis' "covered claim" could not include any amount for which he had received payment, i.e. the payment of $10,000. Thus, the unpaid "covered claim" would total $40,000—the entire claim of $50,000 minus the payments of $10,000. Under the nonduplication clause, the "covered claim" ($40,000) is reduced by the amount of any recovery under an insurance policy ($10,000), creating a final obligation of $30,000. It is apparent from this example that the Fund would receive a double deduction for the payments made from another insurer under the interpretation offered by the Fund. In contrast, under the definition of "covered claim" which I have set forth, Mr. Kachanis' "covered claim" would be $50,000. Under the nonduplication of recovery clause, the Fund could reduce the claim by the $10,000 received from the other insurers. After this reduction, the Fund would owe Mr. Kachanis $40,000. I believe such an outcome is required by the language of the Insolvency Act and does not penalize either the Fund nor potential claimants. Thus, Mr. Kachanis'

claim is a covered claim to the extent it is against the now insolvent AU.

## B) AMOUNT DUE AN INSURER

The Insolvency Act excludes any amount "[d]ue any reinsurer, insurer, insurance pool, or underwriting association, as subrogation recoveries or otherwise." R.I.Gen.Laws at § 27–34–5(8)(b)(iii). The Fund argues that "this Court should enter a declaration that the Fund has no obligation to Kachanis, inasmuch as the United States, as Kachanis' insurer, would ultimately benefit from any payment by the Fund to Kachanis." Opp'n of Fund at 2. According to the Fund, the United States is an "insurer" under the FECA workers' compensation system. Further, under FECA, any recovery by Mr. Kachanis is subject to the subrogation right of the United States. Therefore, any payment to Mr. Kachanis would be "due an insurer."

The United States and Mr. Kachanis argue in response that the use of the term "insurer" in the above phrase refers only to "member insurers." The Insolvency Act defines "member insurer" as "any person who (a) writes any kind of insurance to which this chapter applies ... and (b) Is licensed to transact insurance in this state." R.I.Gen. Laws § 27–34–5(11). The United States is clearly not a "member insurer" since the United States is not licensed to transact insurance in the state of Rhode Island. Thus, the only question is whether the clause applies to "member insurers" only or whether the clause applies to insurers who do not participate in the Fund.

In *Ferrari,* 402 N.E.2d 107, the court addressed the identical question. "We are faced with the question, therefore, whether the exclusion of amounts due an insurer from claims for which the Fund must pay is limited to Fund members or whether ... the exclusion extends to segments of the insurance industry which are not participants in the Fund." *Id.* at 109. In reaching its decision, the court interpreted provisions with identical language as the Rhode Island act. Similar to the Rhode Island act, the Massachusetts act exempted workers' compensation from participation in the Fund. Fur-

ther, the Massachusetts act excluded "any amount due a reinsurer, insurer, insurance pool, or underwriting association, as subrogation or otherwise" from the definition of covered claim. *Id.* at 108. The definition of "insurer" in the Massachusetts act and the definition of "member insurer" in the Rhode Island Insolvency Act are identical.

The *Ferrari* court held that the exclusion for "amounts due an insurer" extends to insurers who are not member insurers. "An insurance pool or underwriting association would not fit into the ... definition of "insurer" as a member insurer, and the class referred to in the exclusion provision must, in context, mean something more, i.e., insurers beyond member insurers." *Id.* at 109. Further, the court noted that the Massachusetts act is patterned on the Post–Assessment Property and Liability Insurance Guaranty Association Model Act. *Id.* at 109. In the Model Act, the term "member insurer" is equivalent to the Massachusetts definition of "insurer" and "[t]he covered claim exclusion refers to any insurer, without the member qualification." *Id.* at 109 (citations omitted). "Reading [the Massachusetts act] as a whole and comparing it to the Model Act, we perceive no design by the Legislature to expand the category of covered claims." *Id.* The court therefore held that the exclusion extended to segments of the insurance industry that are not participants in the Fund.

Mr. Kachanis and the United States contend that *Ferrari* is incorrect and cite *McKenzie Tank Lines, Inc. v. Empire Gas Corp.*, 538 So.2d 482 (Fla.App.1989) in support of their position. In *McKenzie*, McKenzie and Empire Gas were co-defendants in a negligence action. Empire settled with multiple plaintiffs on behalf of Empire and McKenzie. In a trial on the liability as between Empire and McKenzie, McKenzie was found one hundred percent liable. Empire then filed a suit for contribution seeking recovery from McKenzie of the amounts paid in settlement to the plaintiffs in the underlying action. During the pendency of the contribution action, McKenzie's insurance carrier became insolvent and the Florida Insurance Guaranty Association (FIGA) became the successor insurer. The court first noted

that "the FIGA statute is to be 'liberally construed' to effect the purposes" of the statute. *Id.* at 485. Then the court held "since Empire is not a 'member insurer,' the act does not bar Empire's subrogation rights against McKenzie." *Id. See also Arnone v. Murphy*, 153 N.J.Super. 584, 380 A.2d 734, 739 (Ct.Law Div.1977) ("the term 'insurer' as used in the [definition of 'covered claim'] must be read to refer to 'member insurer' ").

*McKenzie* is factually distinct from the case before me. The obligation of the Fund stemmed from a court ordered judgment. Further, any recovery Empire received from the Fund was not due any insurer but rather would be retained by Empire, a gas storage company. Finally, the decision in large part turned on whether Empire's claim should be excluded because it was asserting a subrogation right. However, the court stated "[t]he FIGA statute's prohibition against recovery by member insurers of their subrogation claims is concerned with insurers' contractually derived subrogation rights arising under their policies, rather than legal subrogation rights acquired by a party such as Empire." *McKenzie*, 538 So.2d at 486.

In contrast, the *Ferrari* court addressed identical language and an analogous factual situation. In *Ferrari*, the issue was whether workers' compensation payments could be deducted from the obligations of the Fund. Further, the court discussed the language of the Model Act which has the same language as the Rhode Island Insolvency Act: a definition of "member insurer" and an exclusion for "any insurer." I agree with the reasoning of the *Ferrari* court and adopt its interpretation of the covered claim exclusion for "any insurer." I therefore hold that the exclusion does not address member insurers only but rather encompasses insurance entities which do not participate in the Fund.

 This holding leads me directly back to the most litigated issue in this case— whether the United States is an insurer. As set forth above, I have previously held that FECA does not specifically relate to the business of insurance and that the Insolvency Act does relate to the business of insurance. In the preemption analysis, I did not expressly decide whether the United States

should be considered an entity within the insurance industry. The Fund argues that the United States should be considered a self-insurer within the contexts of FECA payments. Opp'n of Fund at 17. To adopt the position proposed by the Fund, I must hold that while FECA does not specifically relate to the business of insurance, the United States is an insurer in the context of FECA payments. I agree with the United States that such an argument is glaringly inconsistent: if the United States is an insurer, it seems that FECA must necessarily relate to the business of insurance. There are, however, several reasons for which I must adopt the position of the Fund.

First, although I must confess that I am troubled by such a ruling, I am bound by precedent. As previously discussed, the *Fabe* decision held that a federal statute did not specifically relate to the business of insurance and the state statute at issue applied to the United States government. The *Fabe* decision, because it applied the three prong *Pireno* test, implicitly includes a ruling that the United States is an entity within the insurance business.

Second, under the preemption analysis set forth above, in areas of conflict, FECA must fall to the Rhode Island Insolvency Act. I must therefore treat FECA as a statutory scheme on an equal level with the Insolvency Act. Several courts have considered the interaction of workers' compensation liens and statutes similar to the Insolvency Act. "The Guaranty Act simply says that ... as between the workers' compensation system and the [Fund], the loss must be absorbed by the workers' compensation system." *Ventulett v. Maine Ins. Guaranty Ass'n*, 583 A.2d 1022, 1025 (Maine 1990). *See also Ferrari*, 402 N.E.2d at 486. In *Arnone v. Murphy*, the court drew a distinction between a workers' compensation lien and a covered claim. "The fact that plaintiff has previously received a workers' compensation award which conferred a statutory lien in favor of the compensation carrier does not take plaintiff's claim outside of the 'covered claim' context ..." *Arnone*, 380 A.2d at 739. In *Ferrari*, the court rejected this distinction. "Since in

our statutory scheme any sum recovered against a third party is 'for the benefit of the insurer,' we find the reasoning in *Arnone v. Murphy* unpersuasive, and we decline to follow it." *Ferrari*, 402 N.E.2d at 110 (citations omitted). Under the statutory scheme of FECA, the United States has a clear subrogation right to any recovery received by Mr. Kachanis, 5 U.S.C. § 8131, under which Mr. Kachanis would be required to refund to the United States any recovery he received, *id.* at § 8132. I find the reasoning of *Ferrari* persuasive and therefore hold that any amount which would be owed by the Fund cannot be paid to Kachanis since it is an amount due an insurer.[10]

## IV. *Summary*

Under the McCarran–Ferguson Act, FECA does not preempt the Rhode Island Insurers' Insolvency Act because FECA does not specifically relate to the business of insurance and the Insolvency Act was enacted for the purposes of regulating the business of insurance. Under the Insolvency Act, a claim is not "unpaid" merely because some of that claim has been satisfied from another source. Finally, any payments to a claimant which the claimant would be required to refund to the United States under FECA is "an amount due [an] insurer" and is therefore excluded from the "covered claim." The United States would be entitled to a refund from any recovery Mr. Kachanis received from the Fund. Therefore, the Fund is not obligated to Mr. Kachanis for any recovery. At first glance, this result may seem unduly harsh in that it denies recovery to Mr. Kachanis. However, any recovery Mr. Kachanis received would simply be handed over to the United States to satisfy the subrogation lien. It is the United States which is the party truly unable to recover its expenditures. However unfortunate this result may be, it is one which is required by the statutory language and legal precedent.

SO ORDERED.

---

10. In light of this holding, I need not address the remaining arguments of the United States and Mr. Kachanis. Regardless of the standard applied, the Fund is not required to pay Mr. Kachanis because the recovery received would be due an insurer.