**UNITED STATES of America**

v.

**RHODE ISLAND INSURERS' INSOLVENCY FUND.**

Civ. A. No. 94–0545B.

United States District Court,
D. Rhode Island.

July 6, 1995.

Michael P. Iannotti, U.S. Atty.'s Office, Providence, RI, for plaintiff.

Thomas C. Angelone, Hodosh, Spinella & Angelone, Providence, RI, Joseph Tanski, Joseph C. Marrow, and Margaret A. Robbins, Hutchins, Wheeler & Dittmar, Boston, MA, for defendant.

### MEMORANDUM AND ORDER

FRANCIS J. BOYLE, Senior District Judge.

The parties have filed cross motions for judgment on the pleadings under Fed. R.Civ.P. 12(c). The Court referred the motions to Magistrate Judge Robert W. Lovegreen pursuant to 28 U.S.C. § 636(b)(1)(B) for proposed findings and recommendations for disposition. Magistrate Judge Lovegreen issued his Report and Recommendation on April 26, 1995, recommending that the Court grant plaintiff's motion and deny defendant's motion. Plaintiff filed an objection to the Report and Recommendation, and a hearing was conducted on July 5, 1995.

After a *de novo* review of the parties' cross motions and upon consideration of the record and the parties' arguments, the Court is in agreement with the Report and Recommendation of the Magistrate Judge. The Report and Recommendation is adopted in whole as the opinion of this Court.

The motion of the plaintiff for judgment on the pleadings is granted, and the motion of the defendant for judgment on the pleadings is denied.

IT IS SO ORDERED.

### REPORT AND RECOMMENDATION

LOVEGREEN, United States Magistrate Judge.

Before me are cross motions for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). The plaintiff, United States of America ("USA"), brought this action pursuant to 42 U.S.C. § 1395y(b), the Medicare secondary payer ("MSP") statute, to compel the defendant, Rhode Island Insurers' Insolvency Fund (the "Fund"), to reimburse the federal Medicare program for certain payments made by Medicare on behalf of three Medicare beneficiaries. These motions have been referred to me for preliminary review, findings and recommended disposition. 28 U.S.C. § 636(b)(1)(B) and Local Rule of Court 32(c). For the following reasons, I recommend that the defendant's motion for judgment on the pleadings be denied, and the plaintiff's motion for judgment on the pleadings be granted.

### Facts

The Fund is a non-profit entity established by the Rhode Island Insurers' Insolvency Fund Act, R.I.Gen.Laws § 27–34–1 *et seq.* (the "Fund Act"), to administer and pay claims against insolvent Rhode Island insurers. During the calendar years of 1989 and 1990, the Medicare program made payments on behalf of three Medicare beneficiaries, Susan McManus, Manuel Phillips and Sarah Mahoney, in the amounts of $8,071.37, $5,826.79 and $202.84, respectively, for medical services arising out of injuries sustained by each beneficiary in an automobile or other type of accident. After these payments were made, each beneficiary asserted a liability claim for his or her injury under policies issued by the American Universal Insurance Company ("AUIC"), a Rhode Island insurance company which had previously become insolvent.

Because AUIC had become insolvent, the Fund made payment pursuant to its statutory mandate, the Fund Act, on the claims

asserted by each of the beneficiaries. However, based upon its interpretation of the Fund Act, the Fund reduced the amount paid to each beneficiary by the amounts previously paid by the Medicare program.

Purportedly acting under the authority of the MSP statute, the USA has demanded reimbursement of the amounts paid by the Medicare program for beneficiaries McManus, Phillips and Mahoney. The Fund refused to make such payment, however, because it contends it is prohibited by the Fund Act from doing so. This action followed in which the USA seeks to compel the Fund to reimburse the Medicare program as has been previously demanded. Thus, the specifics of the MSP statute and the Fund Act are relevant to a determination of the parties cross motions for judgment on the pleadings and it is to those statutes and attendant regulations that I now turn.

### Statutory Framework

I. *The Medicare Secondary Payer Statute, 42 U.S.C. § 1395y(b)(2), and Attendant Regulations*

Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, established and delineates the federal program commonly known as Medicare which pays for medical treatment for the aged and disabled. Congress has charged the Secretary of the United States Department of Health and Human Services ("HHS") with responsibility for administering the Medicare program and has authorized her to "prescribe such regulations as may be necessary to carry out [its] administration." 42 U.S.C. § 1395hh(a)(1).

The MSP statute provides that a Medicare payment cannot be made for a medical service to the extent that payment has been or can reasonably be expected to be made promptly under an automobile or liability insurance policy or plan or under no fault insurance except as otherwise described in the statute. 42 U.S.C. § 1395y(b)(2)(A). The statute goes on to provide that a Medicare payment for a medical item or service may be made under the circumstances described in § 1395y(b)(2)(A) but that such payment "shall be conditioned on reimbursement to [the Medicare program] when notice or other information is received that payment for such item or service has been or could be made" by an automobile or liability insurance policy or plan or under no fault insurance. 42 U.S.C. § 1395y(b)(2)(B)(i). The MSP statute also provides the USA with a direct right of action against "any entity which is required or responsible under [the MSP statute] to pay with respect to such item or service ... under a primary plan (and may, in accordance with [§ 1395y(b)(3)(A) ] collect double damages against that entity)...." 42 U.S.C. § 1395y(b)(2)(B)(ii). Section 1395y(b)(3)(A) establishes "a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with [§ 1395y(b)(2)(A) ]." The United States is also subrogated to the right of any individual or entity to payments for such item or service under a primary plan. 42 U.S.C. § 1395y(b)(2)(B)(iii). The MSP statute defines a primary plan to include an automobile or liability insurance policy or plan and no fault insurance. 42 U.S.C. § 1395y(b)(2)(A).

Pursuant to her rulemaking authority, the Secretary of HHS has promulgated regulations implementing the MSP statute. 42 C.F.R. § 411.20 *et seq.* These regulations define a plan as "any arrangement, oral or written, by one or more entities, to provide health benefits or medical care or assume legal liability for injury or illness." 42 C.F.R. § 411.21. The regulations further provide that "Medicare benefits are secondary to benefits payable by a third party payer even if State law or the third party payer states that its benefits are secondary to Medicare benefits or otherwise limits its payments to Medicare beneficiaries." 42 C.F.R. § 411.32(a)(1).

II. *The Rhode Island Insurers' Insolvency Fund Act, R.I.Gen.Laws § 27–34–1 et seq.*

The Fund Act was enacted to
provide a mechanism for the payment of covered claims under certain insurance policies to avoid excessive delay in payment and to avoid financial loss to claim-

ants or policyholders because of the insolvency of an insurer, and to create an entity to assess the cost of the protection and distribute it equitably among member insurers.

R.I.Gen.Laws § 27–34–2. Insurers which write certain types of direct insurance within the State of Rhode Island are required to belong to the Fund and to make contributions thereto in proportion to their respective shares of the state's insurance market. *See* R.I.Gen.Laws §§ 27–34–3; 27–34–6; 27–34–8(a)(3).

When a member insurer becomes insolvent, the Fund is "deemed the insurer to the extent of its obligation on the covered claims and to such extent shall have all rights, duties and obligations of the insolvent insurer as if the insurer had not become insolvent." R.I.Gen.Laws § 27–34–8(a)(2); *see also* R.I.Gen.Laws §§ 27–34–8(a)(1) and (a)(4) (obligating the Fund to pay covered claims). The Fund Act defines a covered claim as "an unpaid claim, including one for unearned premiums, submitted by a claimant, which arises out of and is within the coverage and subject to the applicable limits of an insurance policy to which [the Fund Act] applies issued by an insurer if the insurer becomes an insolvent insurer on or after July 1, 1988." R.I.Gen.Laws § 27–34–5(8). However, the Fund Act excludes from the definition of covered claim "any amount ... [d]ue any reinsurer, insurer, insurance pool, or underwriting association, as subrogation recoveries or otherwise...." R.I.Gen.Laws § 27–34–5(8)(ii)(C). The Act further limits the Fund's obligations to pay covered claims by stating:

> Any person having a claim or legal right of recovery under any governmental insurance or guaranty program which is also a covered claim, shall be required to exhaust first his or her right under that program. Any amount payable on a covered claim under this chapter shall be reduced by the amount of any recovery under the program.

R.I.Gen.Laws § 27–34–12(b).

In summary, the MSP statute and the Fund Act conflict in that they both require primary payment to be made under the opposing statute. Consequently, a determination must be made as to which statute overrides the dictate of the other, an issue to which I now turn.

## *Discussion*

### I. *Fed.R.Civ.P. 12(c) Standard*

 Fed.R.Civ.P. 12(c) allows a party, "[a]fter the pleadings are closed but within such time as not to delay the trial, [to] move for judgment on the pleadings." In reviewing a motion made pursuant to Rule 12(c), a court must accept all of the nonmovant's well-pleaded factual averments as true and draw all reasonable inferences in his or her favor. *Rivera–Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir.1988) (citing *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61 (2d Cir.1985); *Austad v. United States*, 386 F.2d 147, 149 (9th Cir.1967); *Bryson v. Brand Insulations, Inc.*, 621 F.2d 556, 559 (3d Cir.1980)). The court may not grant a Rule 12(c) motion unless it appears beyond doubt that the nonmovant can prove no set of facts in support of his or her claim or defense which would entitle the nonmovant to prevail thereon. *Rivera–Gomez v. Castro*, 843 F.2d at 635 (citing *George C. Frey Ready–Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 553 (2d Cir.1977); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)). Because the dispositive issues of this case are all legal not factual, judgment on the pleadings is an appropriate means of decision.

### II. *Preemption*

The issue central to resolving the conflict present between the MSP statute and the Fund Act is which law preempts the other in the context of this case. I find that the MSP statute preempts the Fund Act in this case, and thus, the USA's motion for judgment on the pleadings should be granted.

> Under the Supremacy Clause, U.S. Const., Art. VI, cl. 2, the enforcement of a state regulation may be preempted by federal law in several circumstances: first, when Congress, in enacting a federal statute, has expressed a clear intent to pre-empt state law; second, when it is clear, despite the

absence of explicit preemptive language, that Congress has intended by legislating comprehensively, to occupy an entire field of regulation and has thereby "left no room for the State to supplement" federal law; and, finally, when compliance with both state and federal law is impossible, or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 698–99, 104 S.Ct. 2694, 2700, 81 L.Ed.2d 580 (1984) (citations omitted). Through the McCarran–Ferguson Act, 15 U.S.C. § 1012(b), Congress has added another layer to the normal preemption analysis. That statute, marked as to its component clauses for purposes of this analysis, provides in pertinent part:

> [First Clause] No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, ... unless such Act specifically relates to the business of insurance. [Second Clause] Provided, That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act [15 U.S.C. § 1 et seq.], and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended [15 U.S.C. § 41 et seq.], shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

15 U.S.C. § 1012(b). The initial question under the McCarran–Ferguson Act is whether the federal statute "specifically relates to the business of insurance" within the meaning of § 1012(b). *Kachanis v. U.S.,* 844 F.Supp. 877, 880 (D.R.I.1994) (citing *Cochran v. Paco, Inc.,* 606 F.2d 460, 464 (5th Cir. 1979)). If the answer to this question is yes, the McCarran–Ferguson Act's protection of state insurance law from federal preemption does not apply, *Kachanis,* 844 F.Supp. at 881, and a traditional preemption analysis is employed. If, however, the federal statute does not specifically relate to the business of insurance, then the question becomes whether the state statute was "enacted for the

purpose of regulating the business of insurance." *Id.* (citing *Cochran v. Paco, Inc.,* 606 F.2d at 464). If the state statute was not enacted for such a purpose, the McCarran–Ferguson Act is again inapplicable. If, on the other hand, the state statute was enacted for this purpose, the final question is whether the federal statute would "invalidate, impair, or supersede" the state statute. *Id.* If yes, the McCarran–Ferguson Act prevents its enforcement over the state statute.

■ The parties initially dispute as to the appropriate analytical method to be employed in deciding the first tier of the McCarran–Ferguson Act inquiry, whether the MSP statute specifically relates to the business of insurance. The Fund argues that the Court must employ the three part test enunciated by the United States Supreme Court in *Union Labor Life Insurance Co. v. Pireno,* 458 U.S. 119, 129, 102 S.Ct. 3002, 3008–09, 73 L.Ed.2d 647 (1982). That court listed the following criteria in determining whether a particular practice is within the business of insurance: (1) whether the practice has the effect of transferring or spreading a policyholder's risk; (2) whether the practice is an integral part of the policy relationship between the insurer and the insured; and (3) whether the practice is limited to entities within the insurance industry. *Id.*

The USA counters that the Supreme Court's more recent decision in *U.S. Dept. of Treasury v. Fabe,* —— U.S. ——, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993), obviates the need to apply the cumbersome *Pireno* test. To be sure, a number of courts have concluded that the MSP statute specifically relates to the business of insurance within the meaning of the McCarran–Ferguson Act without express application of the *Pireno* test, but all of those decision cited by the USA do so with little or no discussion or analysis. *See Colonial Penn Ins. Co. v. Heckler,* 721 F.2d 431, 442 n. 6 (3rd Cir.1983); *Varacalli v. State Farm Mutual Auto. Ins. Co.,* 763 F.Supp. 205, 210 (E.D.Mich.1990); *U.S. v. Blue Cross and Blue Shield of Michigan,* 726 F.Supp. 1517, 1523 (E.D.Mich.1989); *Abrams v. Heckler,* 582 F.Supp. 1155, 1165 n. 8 (S.D.N.Y.1984). This may result from what those courts considered to be the obviousness

of their conclusion. Regardless, with their dearth of analysis on the issue, none of those decisions can be interpreted as obviating the need to apply the *Pireno* test. Moreover, the USA's characterization of *Fabe*, — U.S. —, 113 S.Ct. 2202, as setting forth this proposition is incorrect.

 The court in *Fabe* did not abandon the use of the *Pireno* test. In fact, it specifically utilized the test, although it did not apply each of the three prongs individually and meticulously. *See Fabe*, — U.S. at —, 113 S.Ct. at 2209. Instead, the court emphasized that the actual performance of an insurance contract satisfies the components of the *Pireno* test. *Id.* The court did note, however, that the *Pireno* decision involved the scope of the antitrust immunity located in the second clause of the McCarran–Ferguson Act which was more narrowly circumscribed than the first clause at issue in *Fabe*, whether a state law was enacted for the purpose of regulating the business of insurance. *Id.* The court implied then that an analysis under this first clause would encompass more practices within the anti-preemption protection of the McCarran–Ferguson Act than one under the second clause related to anti-trust immunity. *Id.* at — – —, 113 S.Ct. at 2209–10. The *Fabe* court stated:

> The language of [§ 1012(b) ] is unambiguous: the first clause commits laws "enacted ... for the purpose of regulating the business of insurance" to the States, while the second clause exempts only "the business of insurance" itself from the antitrust laws. To equate laws "enacted ... for the business of insurance" with the "business of insurance" itself, as petitioner urges us to do, would be to read words out of the statute. This we refuse to do.
>
> The broad category of laws enacted "for the purpose of regulating the business of insurance" consists of laws that possess the "end, intention, or aim" of adjusting, managing, or controlling the business of insurance. This category necessarily encompasses more than just the "business of insurance."

*Id.* This can be interpreted as the court's approval of utilizing the *Pireno* test more broadly in the context of that portion of the first clause of § 1012(b), relating to whether a state law was enacted "for the purpose of regulating the business of insurance." While this portion of the *Fabe* decision does not go on to discuss the other half of that first clause, relating to whether a federal law "specifically relates to the business of insurance," it is logical to extend this broader interpretation of the *Pireno* test in that context as well. Just as a category of laws enacted "for the purpose of regulating the business of insurance" necessarily encompasses more than just the "business of insurance," so too must a category of laws that "relate to the business of insurance." Consequently, while the three part *Pireno* test is the guideline in deciding whether a federal law "specifically relates to the business" of insurance, it should be interpreted with some liberality when applied to that clause. Further, not one of the *Pireno* criteria is necessarily determinative in itself; rather, they must be judged collectively, and § 1012(b)'s protection need not be denied solely because one of the criteria is not satisfied. *Pireno*, 458 U.S. at 129, 133, 102 S.Ct. at 3008–09, 3010–11.

 The Supreme Court in *Fabe* reemphasized a common theme to McCarran–Ferguson Act analysis: "Statutes aimed at protecting or regulating [the relationship between insurer and insured], directly or indirectly, are laws regulating the 'business of insurance,' within the meaning of the phrase." *Fabe*, — U.S. at —, 113 S.Ct. at 2208 (quoting *SEC v. National Securities, Inc.*, 393 U.S. 453, 460, 89 S.Ct. 564, 568–69, 21 L.Ed.2d 668 (1969)). The court also read its prior decisions in *Pireno* and *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), *reh'g denied*, 441 U.S. 917, 99 S.Ct. 2017, 60 L.Ed.2d 389 (1979), to include the writing of insurance contracts and their performance within the business of insurance as the term is used in the first clause of § 1012(b). *Fabe*, — U.S. at —, 113 S.Ct. at 2209. These rules on their face compel the conclusion that the portion of the MSP statute that makes Medicare payments conditional on reimbursement, 42 U.S.C. § 1395y(b)(2)(B)(i), falls within the business

of insurance as the *Fabe* court interpreted the *Pireno* test.

The Medicare Program itself is certainly a form of an insurance program, with its enabling and defining statute, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, serving, in effect, as the policy defining its terms and the relationship between the insuring entity, the United States government, and the insureds, those entitled to Medicare benefits. Title XVIII has been described as an act which

> protect[s] individuals 65 years of age and over from the high cost and the hardship of illness. Part A is a *program of hospital insurance.* It is a trust fund, the source of which is taxes paid by the employees, employers and self-employed persons. The benefits available under Part A include hospital coverage and a variety of post hospital home health care services....
>
> Part B creates a *supplementary medical insurance* for the aged. The beneficiaries enroll voluntarily in the program and pay monthly premiums which are matched by federal contributions and form a trust fund. It provides coverage in areas where Part A does not, but the types of services are the same.

*Martinez v. Richardson,* 472 F.2d 1121, 1123 (10th Cir.1973) (emphasis added). The provisions of Title XVIII itself repeatedly refer to the Medicare program as insurance and is in fact entitled Health Insurance for the Aged and Disabled. *See e.g.* 42 U.S.C. § 1395a ("Any individual entitled to *insurance benefits* under this title [42 U.S.C. § 1395 et seq.] may obtain health services from any institution, agency, or person qualified to participate under this title [42 U.S.C. § 1395 et seq.] if such institution, agency, or person undertakes to provide him such services.") (emphasis added); 42 U.S.C. § 1395c (entitled "Description of program" and stating *"The insurance program* for which entitlement is established by sections 226 and 226A [42 U.S.C. §§ 426 and 426–1] provides basic protection against the costs of hospital, related post-hospital, home health services, and hospice care in accordance with this part [42 U.S.C. § 1395c et seq.] ...") (emphasis added); 42 U.S.C. § 1395d(a) ("The benefits provided to an individual by *the insurance program* under this part [42 U.S.C. § 1395c] shall consist of entitlement to have payments made on his behalf ... for ... inpatient hospital services ... post-hospital extended care services ... home health services; and ... hospice care....") (emphasis added). Thus, it is beyond serious debate that the Medicare program is in fact an insurance program. It follows then that the provisions of Title XVIII which govern the relationship between the insurer, the Medicare program, and the insured, Medicare beneficiaries, and define the terms of the program's performance can be considered as specifically relating to the business of insurance under the McCarran–Ferguson Act. *See U.S. Dept. of Treasury v. Fabe,* —— U.S. at ——, ——, 113 S.Ct. at 2208, 2209 (holding that statutes which regulate the relationship between insurer and insured and the actual performance of an insurance contract are within the business of insurance as determined under the *Pireno* test). Further, I have found nothing in the case law pertaining to the McCarran–Ferguson Act to indicate that it in any way matters that Medicare is a public insurance program as opposed to one for profit, managed by a private company. The McCarran–Ferguson Act is concerned with the relationship between insurer and insured and the contract of insurance between these parties. *Id.* As described above, the Medicare program has these attributes and thus, should be considered within the business of insurance for purposes of the first clause of the McCarran–Ferguson Act.

The statute mandates that payments made by the Medicare program to Medicare beneficiaries are conditional on any corresponding payment made under any automobile or liability insurance policy or plan. 42 U.S.C. § 1395y(b)(3)(B)(i). Defining the specific conditions under which insurance payments will be made clearly is a regulation of the relationship between the insurer and insured. Moreover, it is a clear example of regulation of the performance of the insurance program, as payment of benefits is the quintessential element of performance under an insurance contract. Thus, the MSP's mandate that Medicare payments are conditioned on reimbursement by corresponding payments under

a liability insurance policy found in 42 U.S.C. § 1395y(b)(3)(B)(i) is specifically related to the business of insurance within the meaning of the McCarran–Ferguson Act.

The remaining provisions of the MSP statute at issue are likewise related, under a somewhat different analysis. The statute provides the USA with a direct right of action to recover payment made under Medicare from any entity which is responsible under a liability insurance policy to pay for that item or service previously paid for by Medicare. 42 U.S.C. §§ 1395y(b)(2)(B)(ii), 1395y(b)(3)(A). The United States is also subrogated to the right of any individual or entity to payments for such item or service under a liability insurance plan. 42 U.S.C. § 1395y(b)(2)(B)(iii). While these provisions may not be said to regulate the relationship between the Medicare program and its insureds, they nevertheless pass the technical strictures of the three part *Pireno* test. Again, the criteria to be considered under that test are: (1) whether the practice has the effect of transferring or spreading a policyholder's risk; (2) whether the practice is an integral part of the policy relationship between the insurer and the insured; and (3) whether the practice is limited to entities within the insurance industry. *Pireno*, 458 U.S. at 129, 102 S.Ct. at 3008–09.

By mandating that payment be made primarily under liability insurance policies and secondarily by Medicare, the MSP statute undoubtedly affects a transference or spreading of insureds' risk. "The transfer of risk from insured to insurer is effected by means of the contract between the parties—the insurance policy—and that transfer is complete at the time that contract is entered." *Pireno*, 458 U.S. at 130, 102 S.Ct. at 3009. By mandating which entity will assume the risk of paying for injuries covered both by Medicare and liability insurance policies, the MSP in fact determines how that risk will be spread among the parties involved. By providing the United States with direct and subrogation rights against liability insurers who do not comply with this mandate, Congress has simply provided a necessary means to compel compliance with its risk spreading mandate.

The relevant portions of the MSP statute, mandating that payment for injuries be made primarily by liability insurance policies and secondarily by Medicare, 42 U.S.C. § 1395y(b)(2)(A) and (B), are also limited to entities within the insurance industry as is required by the *Pireno* test. The MSP statute makes specific reference to automobile or liability insurance or no fault insurance in naming entities required to pay primary to Medicare. 42 U.S.C. § 1395y(b)(2)(A). As a result, it cannot be argued that these provisions apply to entities outside of the insurance industry.

Admittedly, whether the MSP statute's mandate, that liability insurers pay primary to Medicare, conforms to *Pireno*'s requirement that the practice at issue amounts to an integral part of the policy relationship between insurer and insured is not as certain as my conclusions based on the other two parts of the *Pireno* test. In this context, it is important to note the *Fabe* court's loosening of the strictures of the *Pireno* test when applying it to the first clause of the McCarran–Ferguson Act as we do here, *Fabe*, —— U.S. at —— – ——, 113 S.Ct. at 2209–10, and the *Pireno* court's own caution that not one of the *Pireno* criteria are necessarily determinative in itself; rather, they must be judged collectively, and § 1012(b)'s protection need not be denied solely because one of the criteria is not satisfied. *Pireno*, 458 U.S. at 129, 133, 102 S.Ct. at 3008–09, 3010–11.

Certainly, the MSP statute's mandate has a significant affect on the relationship between the Medicare program and its beneficiaries, as well as private liability insurers and their insureds, by virtue of the fact that it directs which entity will assume the risk for certain injuries. Such a direction impacts on the relationship between insurer and insured as mandated risk assumption may naturally result in a renegotiation of the policies between liability insurers and their insureds. Specifically, because liability insurers may no longer rely on paying secondarily to Medicare, they may now in fact charge their insureds higher premiums to offset the added expense. This effect is most certainly part of the relationship between insurers and their insureds. Consequently, the MSP statute

satisfies the three part *Pireno* test and is therefore specifically related to the business of insurance under the McCarran–Ferguson Act. As a result, that act does not apply to this case to protect the state statute, the Fund Act, from federal preemption by the MSP statute.

The Fund relies heavily on this Court's prior decision in *Kachanis v. U.S.*, 844 F.Supp. 877, in its argument that the McCarran–Ferguson Act does apply in this case to protect the Fund Act from federal preemption. That decision held that the McCarran–Ferguson Act did protect the Fund Act from preemption by the Federal Employees' Compensation Act ("FECA"), 5 U.S.C. § 8101 *et seq.*, *Kachanis v. U.S.*, 844 F.Supp. at 885, but that opinion is distinguishable from the present case. At the threshold, the *Kachanis* opinion decided that FECA was not specifically related to the business of insurance within the meaning of the McCarran–Ferguson Act, *id.* at 882–82, and this is where it is distinguishable from the present case. First, the *Kachanis* decision notes that "while FECA does provide insurance-like benefits to employees, there is no specific mention of insurance in the statute ... [n]or is there any indication within FECA of an impled repeal of the McCarran Ferguson Act." *Id.* Such is clearly not the case with the MSP statute. It expressly makes automobile and liability insurance policies or plans primary payors and Medicare secondary. Moreover, the legislative history of the MSP statute contains a " 'clear manifestation of [Congress'] intention' to make Medicare secondary to auto insurance benefits. Since [the state law] does precisely the opposite, Congress could only have intended to override [it]." *Abrams v. Heckler*, 582 F.Supp. at 1165. With such glaring differences between FECA and the MSP statute, it is not difficult to reconcile the *Kachanis* opinion with this one and to conclude that it is not persuasive here.

■ Having determined that the McCarran–Ferguson Act does not apply to the conflict between the MSP statute and the Fund Act, the focus must now shift to normal preemption analysis. As stated above, the enforcement of a state law may be preempted by federal law when compliance with both state and federal law is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. at 698–99, 104 S.Ct. at 2699–2700. Such is the case here. As described, the MSP statute requires that benefits payable under an automobile or liability insurance policy or plan be primary to benefits payable under the Medicare program and provides the USA with direct and subrogation rights to enforce this requirement. 42 U.S.C. § 1395y(b)(2). The Budget Committee Report that accompanied the House version of the MSP statute reveals that Congress' purpose in enacting the act was to relieve Medicare of the obligation of paying for services when payment was available under a liability insurance policy. H.R.Rep. No. 96–1167, 96th Cong., 2d Sess. 389, *reprinted in*, 1980 U.S.C.C.A.N. 5526, 5752, *quoted in*, *Abrams v. Heckler*, 582 F.Supp. at 1164.

The Fund Act mandates the exact opposite, requiring a claimant under a liability insurance policy issued by an insolvent insurer to first exhaust any right of recovery under Medicare, R.I.Gen.Laws § 27–34–12, and allowing the Fund to subtract from any claim they pay any amount due as subrogation recovery, R.I.Gen.Laws § 27–34–5(8)(ii)(C). Clearly, enforcement of both laws is impossible and the state law stands as an obstacle to Congress' purpose in enacting the MSP statute. Thus, the MSP statute preempts the Fund Act in this case.

Application of the MSP statute unhindered by the conflicting mandates of the Fund Act results in the USA prevailing on the parties' cross motions for judgment on the pleadings. There is no question here that the AUIC policies under which Susan McManus, Manuel Phillips and Sarah Mahoney made claims for their injuries are automobile or liability insurance policies as stated in the MSP statute. 42 U.S.C. § 1395y(b)(2). Once AUIC became insolvent the Fund is "deemed [to be AUIC] to the extent of its obligation on the covered claims and to such extent shall have all rights, duties and obligations of [AUIC] as if the insurer had not become insolvent."

**380**

R.I.Gen.Laws § 27–34–8(a)(2). Under this condition, the Fund is obligated to pay all covered claims, R.I.Gen.Laws §§ 27–34–8(a)(1) and (a)(4), which are defined as unpaid claims which arise out of and are within the coverage and subject to the applicable limits of an AUIC policy, R.I.Gen.Laws § 27–34–5(8). The Fund does not dispute that McManus, Phillips and Mahoney's claims were covered claims and in fact paid them except for the amount which had been previously paid them by Medicare. The provision of the Fund Act that the Fund relied on to except those amounts from their payment on the covered claims are preempted by the MSP statute and thus have no force or effect in this case. Consequently, those amounts are also covered claims and subject to recovery by the USA which has direct and subrogation rights for such recovery pursuant to the MSP statute. 42 U.S.C. §§ 1395y(b)(2)(ii) and (iii). Further, § 1395y(b)(3) provides for double damages when a liability insurance policy or plan fails to provide for primary payment. Thus, the U.S.A. is entitled to recovery under the MSP statute.

### Conclusion

For the reasons stated, I recommend that the defendant's motion for judgment on the pleadings be denied, and the plaintiff's motion for judgment on the pleadings be granted.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt. Local Rule of Court 32; Fed.R.Civ.P. 72(b). Failure to file specific objections in a timely manner constitutes a waiver of the right to review by the district court. *United States v. Valencia–Copete*, 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980).

April 26, 1995