**UNITED STATES of America,**
**Plaintiff, Appellee,**

v.

**RHODE ISLAND INSURERS'**
**INSOLVENCY FUND,**
**Defendant, Appellant.**

**No. 95–1964.**

United States Court of Appeals,
First Circuit.

Heard Jan. 12, 1996.

Decided April 5, 1996.

Margaret A. Robbins, with whom Joseph C. Tanski and Hutchins, Wheeler & Dittmar, Boston, MA, were on brief for appellant.

Clifford M. Pierce, Assistant Regional Counsel, Department of Health and Human Services, Boston, MA, with whom Sheldon Whitehouse, United States Attorney, and Michael P. Iannotti, Providence, R.I., Assistant United States Attorney, were on brief for appellee.

Before TORRUELLA, Chief Judge, CYR and STAHL, Circuit Judges.

CYR, Circuit Judge.

The question in this appeal is whether section 1395y(b)(2)(A) of the Medicare Secondary–Payer Act, 42 U.S.C. § 1395y(b)(2)(A) (the "MSP provision"), preempts various sections of the Rhode Island Insurers' Insolvency Fund Act (the "RIIIFA") which purport to shift financial responsibility for "primary" insurance coverage from the Rhode Island Insurers' Insolvency Fund (the "Fund") to the federal Medicare program. The district court held the challenged RIIIFA provisions preempted, the Fund appealed, and we now affirm.

## I

### BACKGROUND

Enacted by the Rhode Island Legislature in 1988, the RIIIFA requires all insurers licensed in Rhode Island to make *pro rata* monetary contributions to the Fund to meet certain types of insurance claims lodged against licensed Rhode Island insurers which have become insolvent, R.I.Gen.Laws § 27–34–3 (listing excluded classes of insurance claims). Upon a declaration of insolvency by a licensed Rhode Island insurer, the Fund is "deemed [to be] the insurer to the extent of the obligations [under the policy] on the covered claims," *id.* § 27–34–8(a)(2), subject to

specified limitations on the amount of coverage, *see, e.g., id.* § 27–34–8(a)(1)(iii) (setting $300,000 cap per claim). The RIIIFA defines the term "covered claim" as "an[y] unpaid [insurance] claim ... submitted by a claimant," *id.* § 27–34–5(8), but excludes any amount "due any ... [other] insurer as subrogation recoveries or otherwise," *id.* § 27–34–5(8)(ii)(C). A "nonduplication of recovery" provision requires all Fund claimants to exhaust in the first instance any "claim or legal right of recovery under any governmental insurance or guaranty program which is also a covered claim," and permits the Fund to reduce its payments on covered claims by the amount thus recoverable. *Id.* § 27–34–12(b).

In 1989–90, the federal Medicare program disbursed approximately $14,000 in medical benefits to three Medicare beneficiaries who had sustained injuries in automobile accidents. When their Rhode Island-licensed automobile insurance carrier, the American Universal Insurance Company ("AUIC"), was declared insolvent, the three Medicare beneficiaries filed claims against the Fund. The Fund allowed their claims but deducted the $14,000 previously disbursed to them under the federal Medicare program, citing RIIIFA §§ 27–34–5(8)(ii)(C) and 27–34–12(b). The United States promptly challenged the deductions on the ground that RIIIFA §§ 27–34–5(8)(ii)(C) and 27–34–12(b), which purport to shift "primary" insurance coverage from the Fund to Medicare, are inconsistent with federal law, and thus preempted.

The pertinent MSP provision, found in Title XVIII of the Social Security Act, 42 U.S.C. § 1395y(b) (Omnibus Budget Reconciliation Act of 1980), was enacted by Congress for the express purpose of lowering overall federal Medicare disbursements by requiring Medicare beneficiaries to exhaust all available private automobile insurance coverage before resorting to their Medicare coverage. *See* H.R.Rep. No. 1167, 96th Cong., 2d Sess. 389, *reprinted in* 1980 U.S.C.C.A.N. 5526; *infra* note 3. To that end, the MSP provision prohibits Medicare payments to a beneficiary for medical expenses if "payment has been made, or can reasonably be expected to be made promptly (as determined in accordance with regulations) under ... an automobile or liability insurance policy or plan (including a self-insured plan) or under no-fault insurance." 42 U.S.C. § 1395y(b)(2)(A); *see also* 42 C.F.R. § 411.32(a) ("Medicare benefits are secondary to benefits payable by a third party payer *even if the State law* or the third party payer *states that its benefits are secondary* to Medicare benefits *or otherwise limits its payments to Medicare beneficiaries.*") (emphasis added).[1] Moreover, once the Medicare program makes a payment on a claim covered by private insurance, the United States becomes subrogated to the rights of the insured, *id.* § 1395y(b)(2)(B)(iii), and may sue the "primary [insurance] plan" for reimbursement in the form of double damages, *id.* § 1395y(b)(2)(B)(ii) & (b)(3)(A).

When the Fund balked at voluntary reimbursement, the United States filed suit in federal district court for $28,000, *see id.* The United States alleged that the MSP provision does not permit the 1989–90 Medicare payments to be characterized as "primary" liability payments, since the injuries to the three Medicare beneficiaries were covered under a "primary plan"—their AUIC automobile insurance policies—and therefore the Fund, as the "deemed" insurer, must meet the maximum $300,000 primary AUIC insurance coverage cap under each beneficiary's policy before Medicare could be held liable. *See* R.I.Gen.Laws § 27–34–8(a)(2). The United States moved for judgment on the pleadings, based on its preemption claim. The Fund filed a cross-motion for judgment on the pleadings, arguing, among other things, that the first clause of the McCarran–Ferguson Act, 15 U.S.C. § 1012(b), *see infra* note 2, forecloses the preemption claim.

The district court granted judgment for the United States. *United States v. Rhode Island Insurers' Insolvency Fund,* 892 F.Supp. 370 (D.R.I.1995). First, the court ruled the McCarran–Ferguson Act's anti-

---

**1.** The Medicare regulations define a "plan" as "any arrangement, oral or written, by one or more entities, to provide health benefits or medi-cal care or assume legal liability for injury or illness." 42 C.F.R. § 411.21.

preemption presumption inapplicable because the MSP provision is a federal statute "specifically relat[ing] to the business of insurance," thus coming within an express exception to the anti-preemption presumption. *Id.* at 374–79. Employing conventional preemption analysis, the district court went on to conclude that the MSP provision, ordaining that Medicare provides "secondary" medical coverage only, cannot coexist with RIIIFA's shift of primary liability to the federal Medicare program as a subrogee-insurer. *Id.* at 379–80.

## II

### *DISCUSSION*

#### A. *Standard of Review*

We review judgments on the pleadings *de novo*, accepting all allegations and reasonable inferences favorable to the appellant. *See Santiago de Castro v. Morales Medina,* 943 F.2d 129, 130 (1st Cir.1991). Similarly, a federal preemption ruling presents a pure question of law subject to plenary review. *See New Hampshire Motor Transp. Ass'n v. Town of Plaistow,* 67 F.3d 326, 329 (1st Cir.1995).

#### B. *The McCarran–Ferguson Act*

As this court has recognized, "[f]ederal preemption under the Supremacy Clause, *see* U.S. Const. art. VI, cl. 2, will be found only if there is 'clear' evidence of a congressional intent to preempt state law, or we are persuaded that the federal and state statutes, by their very terms, cannot coexist." *Summit Inv. and Dev. Corp. v. Leroux,* 69 F.3d 608, 610 (1st Cir.1995); *see also Louisiana Pub. Servs. Comm'n v. FCC,* 476 U.S. 355, 368–69, 106 S.Ct. 1890, 1898–99, 90 L.Ed.2d 369 (1986). In the field of insurance regulation, however, the McCarran–Ferguson Act, 15 U.S.C. §§ 1011–1015, may preclude the

application of normal federal preemption principles provided three conditions are met.[2]

First, the federal statute—here, the MSP provision in Title XVIII—must not "specifically relat[e] to the business of insurance." Second, the state law—here, the RIIIFA—must have been enacted "for the purpose of regulating the business of insurance." Third, the MSP provision must "invalidate, impair, or supersede" the RIIIFA provisions which purport to make the United States the "primary" insurer. *See United States Dep't of the Treasury v. Fabe,* 508 U.S. 491, 500–02, 113 S.Ct. 2202, 2208, 124 L.Ed.2d 449 (1993); *Villafane–Neriz v. FDIC,* 75 F.3d 727, 735 (1st Cir.1996).

The district court ruled the McCarran–Ferguson Act inapplicable because the first precondition recited above was not met; that is, it found that the MSP provision does "specifically relat[e] to the business of insurance." *See Barnett Bank of Marion County v. Nelson,* —— U.S. ——, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996) (holding that a federal statute, 12 U.S.C. § 92, which expressly permits national banks to sell insurance in small towns, is a statute which "specifically relates to the business of insurance," and preempts a state statute which prohibits banks from selling insurance). On appeal, the Fund argues that the MSP provision does not come within the definition of the term "business of insurance" set forth in *Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982). The United States responds that *Pireno,* a case decided under the *second* or "antitrust" clause of 15 U.S.C. § 1012(b), *see supra* note 2, is not applicable in the present case. Because we conclude that the MSP provision is a statute "specifically relating to the business of insurance," irrespective of any formal application of the *Pireno* test, *see Pireno,* 458 U.S. at 129, 102 S.Ct. at 3008–09 (noting that no one factor is

---

**2.** The McCarran–Ferguson Act provides, in pertinent part:

(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: Provided, That ... [the Sherman, Clayton, and FTC antitrust acts] shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

15 U.S.C. § 1012.

dispositive, and that the three-part standard contemplates a balancing test), we need not reach this issue. *See Barnett Bank*, at ——, 116 S.Ct. at 1109 (citing *Pireno* as "context[ ]," but foregoing extended three-factor analysis); *Owensboro Nat'l Bank v. Stephens*, 44 F.3d 388, 391 (6th Cir.1994), cert. denied —— U.S. ——, 116 S.Ct. at 1350, 134 L.Ed.2d 519 (1996); *infra* note 5. The relevant inquiry under the first clause of section 1012(b) of the McCarran–Ferguson Act focuses on two basic elements: "specific relation" and "business of insurance."

### 1. *"Specific Relation"*

The import of the "specific relation" element is readily discernible from its pre-enactment history. Before 1944, the United States Supreme Court consistently had held that the *Dormant* Commerce Clause of the United States Constitution did not invalidate state insurance laws which imposed impermissible burdens on interstate commerce. However, when first confronted with an *affirmative* congressional enactment purporting to regulate the interstate business of insurance directly, the Court ruled that the business of insurance is part of "interstate commerce" and subject to regulation (hence, preemption) under Congress's commerce-clause powers. *See United States v. South–Eastern Underwriters Ass'n*, 322 U.S. 533, 544, 64 S.Ct. 1162, 1168–69, 88 L.Ed. 1440 (1944).

Congress promptly repudiated the holding in *South–Eastern Underwriters*, by enacting the first clause of section 1012(b), *see supra* note 2, which restored immunity from dormant commerce-clause challenges to State insurance laws. *See Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 429–30, 66 S.Ct. 1142, 1154–55, 90 L.Ed. 1342 (1946); *Silver v. Garcia*, 760 F.2d 33, 36–37 (1st Cir.1985). Congress went further, however, by providing that even statutes enacted pursuant to Congress's commerce-clause powers, for general application to interstate commerce, would not preempt state insurance laws unless the federal statute expressly announced Congress's specific intention to inject itself into the area of state insurance law. *See Barnett Bank*, at ——, 116 S.Ct. at 1112

("[T]he [McCarran] Act does not seek to insulate state insurance regulation from the reach of all federal law. Rather, it seeks to protect state regulation primarily against inadvertent federal intrusion—say, through enactment of a federal statute that describes an affected activity in broad, general terms, of which the insurance business happens to comprise one part."). Thus, McCarran–Ferguson Act § 1012 imposes no substantive constraint on the congressional power to regulate insurance, but simply "creates 'a form of inverse preemption, letting state law prevail over general federal rules—those that do not "specifically relate[ ] to the business of insurance." ' " *Villafane–Neriz*, 75 F.3d at 735 (quoting *NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287, 293 (7th Cir. 1992), *cert. denied*, 508 U.S. 907, 113 S.Ct. 2335, 124 L.Ed.2d 247 (1993)). That is to say, section 1012 "impos[es] what is, in effect, a clear-statement rule.' " *Id.* (quoting *Fabe*, 508 U.S. at 506–08, 113 S.Ct. at 2211); *see Barnett Bank*, at ——, 116 S.Ct. at 1113 (rejecting argument that *Fabe*'s "clear-statement" rule imposed any heightened requirement that a federal statute referring to "insurance" must also "use the words 'state law is pre-empted,' or the like").

The parties dispute whether the Medicare *program* itself specifically relates to insurance, since it was established long after the 1945 enactment of the McCarran–Ferguson Act, and, arguably at least, is not the typical insurer contemplated by section 1012 (i.e., a private insurance carrier). For example, the Fund points to the recent decision in *Kachanis v. United States*, 844 F.Supp. 877 (D.R.I.1994), which held that a Federal Employees' Compensation Act ("FECA") provision, which allows the United States to recover in subrogation from any "third party" liable to an injured employee, is not a statute "specifically relating to the business of insurance." *Id.* at 882 ("[W]hile FECA does provide insurance-like benefits to employees, there is no specific mention of insurance in the statute."). However, unlike the plainly generic "third party" reference in FECA, connoting a regulation of general application which might encompass both insurers and non-insurers (e.g., tortfeasors), the MSP provision in the Medicare Act specifically ad-

verts to "insurance," *see* 42 U.S.C. § 1395y(b)(2)(A) (precluding Medicare coverage if "payment has been made, or can reasonably be expected to be made promptly ... under ... an automobile or liability *insurance* policy or plan") (emphasis added), as does its legislative history.[3] Whether the Medicare program or any other governmental "insurer" technically is considered part of the "business of insurance" is not material. *Barnett Bank*, at ——, 116 S.Ct. at 1111 ("The word 'relates' is highly general, and this Court has interpreted it broadly in other pre-emption contexts."). Thus, for example, the Internal Revenue Service is not part of the "business of insurance," and yet we have held that a Treasury Regulation, which resulted in a tax on insurance companies, rendered the McCarran–Ferguson Act "inapplicable by its own terms." *See Hanover Ins. Co. v. Commissioner*, 598 F.2d 1211, 1219 (1st Cir.), *cert. denied*, 444 U.S. 915, 100 S.Ct. 229, 62 L.Ed.2d 169 (1979); *see also Texas Employers' Ins. Ass'n v. Jackson*, 820 F.2d 1406, 1414–15 (5th Cir.1987), *cert. denied*, 490 U.S. 1035, 109 S.Ct. 1932, 104 L.Ed.2d 404 (1989) (holding that the Longshore and Harbor Workers' Compensation Act specifically relates to "business of insurance"). Therefore we conclude that Congress expressly and deliberately injected itself into the area of state insurance law with its enactment of the MSP provision. *See Barnett Bank*, at ——, 116 S.Ct. at 1113 ("The language of the Federal Statute before us is not general. It refers specifically to insurance. Its state regulatory implications are not surprising, nor do we believe them inadvertent.").

### 2. *"Business of Insurance"*

The second element—that the federal statute actually pertain to activities that are part of the "business of insurance"—is satisfied as well. The MSP provision regulates the core relationship between a private insurer and its insured. " 'Statutes aimed at protecting or regulating th[e] relationship [between insurer and insured], directly or indirectly, are laws regulating the "business of insurance." ' " *Fabe*, 508 U.S. at 500–02, 113 S.Ct. at 2208 (quoting *SEC v. National Sec., Inc.*, 393 U.S. 453, 460, 89 S.Ct. 564, 568–69, 21 L.Ed.2d 668 (1969)). The "core" matters encompassed within the term "business of insurance" may include "the type of [insurance] policy that could be issued, its reliability, interpretation, and enforcement," *cf. id.* at 501, 113 S.Ct. at 2208,[4] as well as the stan-

---

**3.** The House Report provides, in relevant part:

Under Title VIII, Medicare will have residual rather than primary liability for the payment of services required by a beneficiary as a result of an injury or illness sustained in an auto accident where payment for the provision of such services can also be made under an automobile *insurance policy.* Under this provision, it is expected that Medicare will ordinarily pay for the beneficiary's care in the usual manner and then seek reimbursement from the private *insurance carrier* after, and to the extent that, such carrier's liability under the private policy for the services has been determined. Under present law, Medicare is the primary payer (except where a workmen's compensation program is determined to be responsible for payment for needed medical services) for hospital and medical services received by beneficiaries. This is true even in cases in which a beneficiary's need for services is related to an injury or illness sustained in an auto accident and the services could have been paid for by a private *insurance carrier* under the terms of an *automobile insurance policy.* As a result, Medicare has served to relieve *private insurers* of obligations to pay the costs of medical care in cases where there would otherwise be liability under the *private insurance contract.* The orig-

inal concerns that prompted inclusion of this program policy in the law—the administrative difficulties involved in ascertaining *private insurance liability* and the attendant delays in payment—no longer justify retaining the policy, particularly if it is understood that immediate payment may be made by Medicare with recovery attempts undertaken only *subsequently* when liability is established. In order to avoid excessive administrative costs and efforts in pursuing minor recoveries, the committee expects the Secretary of HHS to establish in regulations rules regarding the minimum amounts estimated as recoverable and the procedures for seeking recovery from *private carriers.* Such procedures are to be similar to those currently employed by Medicare in seeking recovery in workmen's compensation cases.

H.R.Rep. No. 1167, 96th Cong., 2d Sess. 389, *reprinted in* 1980 U.S.C.C.A.N. 5526, 5752 (emphasis added).

**4.** *Fabe* defines the activities encompassed within the term "business of insurance," albeit in the process of applying the second prong of § 1012(b), i.e., whether a state priority statute is a law enacted "for the purpose of regulating the

622

dards governing performance under insurance contracts, *cf. id.* at 508–10, 113 S.Ct. at 2212. *See, e.g., Barnett Bank,* at ——, 116 S.Ct. at 1111 (noting that 12 U.S.C. § 12 "specifically relates to the business of insurance" because, *inter alia,* it "sets forth certain specific rules prohibiting banks from guaranteeing the 'payment of any premium on insurance policies issued through its agency'"). The MSP provision, and its implementing regulations, explicitly prohibit private insurers from negotiating or enforcing any insurance-contract term which purports to make Medicare the primary-insurance obligor in lieu of a private insurance carrier, even though authorized by state law. *See* 42 C.F.R. § 411.32(a) ("Medicare benefits are secondary to benefits payable by a third party payer *even if the State law* or the third party payer *states [otherwise]*.") (emphasis added). This overt federal intervention—directly controlling the core contract relationship at both the negotiation and performance stages—establishes that the MSP provision "specifically relat[es] to the business of insurance," and fully explains the litany of unanimous decisions that reach the same conclusion—many without extended analysis of the *Pireno* factors.[5] *See Colonial Penn. Ins. Co. v. Heckler,* 721 F.2d 431, 442 n. 6 (3d Cir.1983); *Varacalli v. State Farm*

*Mut. Auto. Ins. Co.,* 763 F.Supp. 205, 209 (E.D.Mich.1990) (citing *United States v. Blue Cross and Blue Shield of Michigan,* 726 F.Supp. 1517, 1523 (E.D.Mich.1989)); *Abrams v. Heckler,* 582 F.Supp. 1155, 1165 n. 8 (S.D.N.Y.1984). As the Medicare Secondary–Payer Statute is a federal statute "specifically relat[ing] to the business of insurance," the McCarran–Ferguson Act is inapplicable and the preemptive effect of the MSP provision upon the Rhode Island Insurers' Insolvency Fund Act therefore must be reviewed under conventional preemption principles.

## C. *Conventional Preemption Analysis*

■ Notwithstanding the inapplicability of the McCarran–Ferguson Act, the Fund argues that the priority mandated by the MSP provision does not trump the RIIIFA, even under conventional preemption analysis, because the priority provisions in the two statutes are compatible. *See Summit Inv. and Dev. Corp.,* 69 F.3d at 610. First, the Fund points out that the MSP provision permits the United States to seek reimbursement only if another insurer has made a payment to the Medicare beneficiary, or if such payment can "reasonably be expected to be made." Consequently, it argues, it would be

---

business of insurance." Nonetheless, *Fabe* is apposite to the extent that "business of insurance" is a term common to both the first and second prongs under § 1012(b). *See Atlantic Cleaners & Dyers v. United States,* 286 U.S. 427, 433, 52 S.Ct. 607, 608–09, 76 L.Ed. 1204 (1932) (same word or phrase used repeatedly in statute is presumed to have same meaning); *Fortin v. Marshall,* 608 F.2d 525, 528 (1st Cir.1979).

5. The more specific challenges made by the Fund, based on the three-factor *Pireno* test, gain it nothing. First, the Fund contends that the MSP provision does not involve a practice which has the effect of transferring or spreading a policyholders' risk, *see Pireno,* 458 U.S. at 129, 102 S.Ct. at 3008–09, because the MSP provision merely shifts risk between the Medicare program and the Fund, not between the *insured* and the Fund. We do not think *Pireno* is to be read so narrowly. It held only that purely peripheral insurance company activities, such as an insurer's use of a medical peer review committee to consider whether claimants' medical bills were "reasonable," are not part of the rough and tumble of risk allocation in insurance contracts. *Id.* at 130–31, 102 S.Ct. at 3009–10. A federal

statute prohibiting a private insurer from imposing the primary insurance obligation on the Medicare program clearly and directly affects the allocation of risk to the policyholder, who is likely to have to pay higher premiums to offset the insurer's increased liability exposure. The same consideration attends to the second *Pireno* factor as well. *Id.* at 129, 102 S.Ct. at 3008–09 (second factor is "whether the [regulated] practice is an integral part of the policy relationship between the [private] insurer and the insured"). Finally, despite the MSP provision that the United States can pursue "any entity" for reimbursement, *see id.* (third factor is "whether the [regulated] practice is limited to entities within the insurance industry"), the MSP provision limits reimbursement to recoveries from "primary plans," whose definition lists only entities which are clearly "within" the insurance industry. *See* 42 U.S.C. § 1395y(b)(2)(A) ("primary plan" means "a group health plan or large group health plan, ... a workmen's compensation law or plan, an automobile or liability insurance policy or plan ... or no-fault insurance"); *cf. Kachanis,* 844 F.Supp. 877 (D.R.I.1994) (holding § 1012 applicable to FECA provision allowing United States to recover from any "third party").

*unreasonable* for any Medicare beneficiary to expect reimbursement from the Fund, because the RIIIFA exhaustion provision explicitly requires claimants to exhaust all governmental insurance before receiving Fund payments. This argument altogether disregards the function of federal preemption, however, by implicitly assuming that the RIIIFA exhaustion provision continues in force notwithstanding the mutually inconsistent allocations of primary insurance liability as denoted in the MSP provision and the RIIIFA. Thus, the Fund's argument is fatally circular: the Medicare beneficiary could "reasonably expect" the Fund to take the primary insurance risk *if* and *because* the MSP provision preempts the Fund's exhaustion provisions.

Second, the Fund contends that it is not a "primary plan," as defined by the MSP provision, *see* 42 U.S.C. § 1395y(b)(2)(B)(ii), (b)(3)(A) ("an automobile or liability insurance policy or plan"), because it is not the Medicare beneficiaries' private insurance carrier, but rather a non-profit governmental agency. The Fund further argues that it is not a "plan," as defined by Medicare regulations, because an insurance insolvency-guarantor statute like the RIIIFA is not an insurance "policy," and therefore is not an "arrangement, oral or written, by one or more entities, to provide health benefits or medical care or assume legal liability for injury of illness." 42 C.F.R. § 411.21; *see supra* note 1. Neither contention is tenable.

The RIIIFA itself provides that, upon a declaration of insolvency, the Fund is "*deemed* the insurer to the extent of the obligations [under the policy] on the covered claims," *see* R.I.Gen.Laws § 27–34–8(a)(2) (emphasis added), subject solely to specified limitations on the amount of coverage. Thus, the Fund is deemed the private insurer, and hence a "primary plan" under the MSP provision and its regulations.[6]

## III

### *CONCLUSION*

For the foregoing reasons, *the district court judgment is affirmed, with costs to plaintiff-appellee.*

---

**6.** Finally, the Fund raises a puzzling challenge to the implicit district court ruling that RIIIFA's preempted provisions are severable from its non-preempted provisions. It argues that no part of RIIIFA can be struck down because the Rhode Island Legislature envisioned the Fund only as a "last resort" for insolvent insurers' policyholders, and that it would not have enacted RIIIFA at all had it known that its core "covered claim" definition was going to be so severely restricted with respect to Medicare benefits. Aside from its conjectural nature, this contention seems counterproductive from the Fund's standpoint. If the preempted RIIIFA provision is not severable, of course, the proper relief is not, as the Fund apparently assumes, a holding that the entire RIIIFA stands as enacted, but the *invalidation* of the *entire* RIIIFA, which would result in appellant's extinction. *See, e.g., Hooper v. Bernalillo County Assessor*, 472 U.S. 612, 624, 105 S.Ct. 2862, 2869, 86 L.Ed.2d 487 (1985). Beyond this, no more need be said, however, as any *non*severability decision is for the Rhode Island courts. *See Zobel v. Williams*, 457 U.S. 55, 65, 102 S.Ct. 2309, 2315–16, 72 L.Ed.2d 672 (1982) (striking down portion of state statute, but leaving ultimate issue of *non*severability for state-court resolution).