USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT  ____________________ No. 95-1964 UNITED STATES OF AMERICA, Plaintiff, Appellee, v. RHODE ISLAND INSURERS' INSOLVENCY FUND Defendant, Appellant.  ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Francis J. Boyle, Senior U.S. District Judge] __________________________  ____________________ Torruella, Chief Judge, ___________ Cyr and Stahl, Circuit Judges. ______________  ____________________ Margaret A. Robbins, with whom Joseph C. Tanski and Hutchins, ____________________ _________________ _________ Wheeler & Dittmar were on brief for appellant. _________________ Clifford M. Pierce, Assistant Regional Counsel, Department of ___________________ Health and Human Services, with whom Sheldon Whitehouse, United States __________________ Attorney, and Michael P. Iannotti, Assistant United States Attorney, ___________________ were on brief for appellee.  ____________________ April 5, 1996  ____________________ CYR, Circuit Judge. The question in this appeal is CYR, Circuit Judge. _____________ whether section 1395y(b)(2)(a) of the Medicare Secondary-Payer Act, 42 U.S.C. 1395y(b)(2)(a) (the "MSP provision"), preempts various sections of the Rhode Island Insurers' Insolvency Fund Act (the "RIIIFA") which purport to shift financial responsi- bility for "primary" insurance coverage from the Rhode Island Insurers' Insolvency Fund (the "Fund") to the federal Medicare program. The district court held the challenged RIIIFA provi- sions preempted, the Fund appealed, and we now affirm. I I BACKGROUND BACKGROUND __________ Enacted by the Rhode Island Legislature in 1988, the RIIIFA requires all insurers licensed in Rhode Island to make pro ___ rata monetary contributions to the Fund to meet certain types of ____ insurance claims lodged against licensed Rhode Island insurers which have become insolvent, R.I. Gen. Laws 27-34-3 (listing excluded classes of insurance claims). Upon a declaration of insolvency by a licensed Rhode Island insurer, the Fund is "deemed [to be] the insurer to the extent of the obligations [under the policy] on the covered claims," id. 27-34-8(a)(2), ___ subject to specified limitations on the amount of coverage, see, ___ e.g., id. 27-34-8(a)(1)(iii) (setting $300,000 cap per claim). ____ ___ The RIIIFA defines the term "covered claim" as "an[y] unpaid [insurance] claim . . . submitted by a claimant," id. 27-34- ___ 5(8), but excludes any amount "due any . . . [other] insurer as subrogation recoveries or otherwise," id. 27-34-5(8)(ii)(C). A ___ 2 "nonduplication of recovery" provision requires all Fund claim- ants to exhaust in the first instance any "claim or legal right of recovery under any governmental insurance or guaranty program which is also a covered claim," and permits the Fund to reduce its payments on covered claims by the amount thus recoverable. Id. 27-34-12(b). ___ In 1989-90, the federal Medicare program disbursed approximately $14,000 in medical benefits to three Medicare beneficiaries who had sustained injuries in automobile accidents. When their Rhode Island-licensed automobile insurance carrier, the American Universal Insurance Company ("AUIC"), was declared insolvent, the three Medicare beneficiaries filed claims against the Fund. The Fund allowed their claims but deducted the $14,000 previously disbursed to them under the federal Medicare program, citing RIIIFA 27-34-5(8)(ii)(C) and 27-34-12(b). The United States promptly challenged the deductions on the ground that RIIIFA 27-34-5(8)(ii)(C) and 27-34-12(b), which purport to shift "primary" insurance coverage from the Fund to Medicare, are inconsistent with federal law, and thus preempted. The pertinent MSP provision, found in Title XVIII of the Social Security Act, 42 U.S.C. 1395y(b) (Omnibus Budget Reconciliation Act of 1980), was enacted by Congress for the express purpose of lowering overall federal Medicare disburse- ments by requiring Medicare beneficiaries to exhaust all avail- able private automobile insurance coverage before resorting to their Medicare coverage. See H.R. Rep. No. 1167, 96th Cong., 2d ___ 3 Sess. 389, reprinted in 1980 U.S.C.C.A.N. 5526; infra note 3. To _________ __ _____ that end, the MSP provision prohibits Medicare payments to a beneficiary for medical expenses if "payment has been made, or can reasonably be expected to be made promptly (as determined in accordance with regulations) under . . . an automobile or liabil- ity insurance policy or plan (including a self-insured plan) or under no-fault insurance." 42 U.S.C. 1395y(b)(2)(A); see also ___ ____ 42 C.F.R. 411.32(a) ("Medicare benefits are secondary to benefits payable by a third party payer even if the State law or ____ __ ___ _____ ___ the third party payer states that its benefits are secondary to ______ ____ ___ ________ ___ _________ Medicare benefits or otherwise limits its payments to Medicare __ _________ ______ ___ ________ __ ________ beneficiaries.") (emphasis added).1 Moreover, once the Medicare _____________ program makes a payment on a claim covered by private insurance, the United States becomes subrogated to the rights of the in- sured, id. 1395y(b)(2) (B)(iii), and may sue the "primary ___ [insurance] plan" for reimbursement in the form of double damag- es, id. 1395y(b)(2)(B) (ii) & (b)(3)(A).  ___ When the Fund balked at voluntary reimbursement, the United States filed suit in federal district court for $28,000, see id. The United States alleged that the MSP provision does ___ ___ not permit the 1989-90 Medicare payments to be characterized as "primary" liability payments, since the injuries to the three Medicare beneficiaries were covered under a "primary plan"   ____________________ 1The Medicare regulations define a "plan" as "any arrange- ment, oral or written, by one or more entities, to provide health benefits or medical care or assume legal liability for injury or illness." 42 C.F.R. 411.21. 4 their AUIC automobile insurance policies and therefore the Fund, as the "deemed" insurer, must meet the maximum $300,000 primary AUIC insurance coverage cap under each beneficiary's policy before Medicare could be held liable. See R.I. Gen. Laws ___ 27-34-8(a)(2). The United States moved for judgment on the pleadings, based on its preemption claim. The Fund filed a cross-motion for judgment on the pleadings, arguing, among other things, that the first clause of the McCarran-Ferguson Act, 15 U.S.C. 1012(b), see infra note 2, forecloses the preemption ___ _____ claim.  The district court granted judgment for the United States. United States v. Rhode Island Insurers' Insolvency Fund, _____________ ______________________________________ 892 F. Supp. 370 (D.R.I. 1995). First, the court ruled the McCarran-Ferguson Act's anti-preemption presumption inapplicable because the MSP provision is a federal statute "specifically relat[ing] to the business of insurance," thus coming within an express exception to the anti-preemption presumption. Id. at ___ 374-79. Employing conventional preemption analysis, the district court went on to conclude that the MSP provision, ordaining that Medicare provides "secondary" medical coverage only, cannot coexist with RIIIFA's shift of primary liability to the federal Medicare program as a subrogee-insurer. Id. at 379-80. ___ II II DISCUSSION DISCUSSION __________ A. Standard of Review A. Standard of Review __________________ 5 We review judgments on the pleadings de novo, accepting __ ____ all allegations and reasonable inferences favorable to the appellant. See Santiago de Castro v. Morales Medina, 943 F.2d ___ ___________________ _______________ 129, 130 (1st Cir. 1991). Similarly, a federal preemption ruling presents a pure question of law subject to plenary review. See ___ New Hampshire Motor Transp. Ass'n v. Town of Plaistow, 67 F.3d __________________________________ _________________ 326, 329 (1st Cir. 1995).  B. The McCarran-Ferguson Act B. The McCarran-Ferguson Act _________________________ As this court has recognized, "[f]ederal preemption under the Supremacy Clause, see U.S. Const. art. VI, cl. 2, will ___ be found only if there is `clear' evidence of a congressional intent to preempt state law, or we are persuaded that the federal and state statutes, by their very terms, cannot coexist." Summit ______ Inv. and Dev. Corp. v. Leroux, 69 F.3d 608, 610 (1st Cir. 1995); ____________________ ______ see also Louisiana Pub. Servs. Comm'n v. FCC, 476 U.S. 355, 368- ___ ____ ____________________________ ___ 69 (1986). In the field of insurance regulation, however, the McCarran-Ferguson Act, 15 U.S.C. 1011-1015, may preclude the application of normal federal preemption principles provided three conditions are met.2   ____________________ 2 The McCarran-Ferguson Act provides, in pertinent part: (a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxa- tion of such business. (b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: Provided, That . . . [the Sher- 6 First, the federal statute here, the MSP provision in Title XVIII must not "specifically relat[e] to the business of insurance." Second, the state law here, the RIIIFA must have been enacted "for the purpose of regulating the business of insurance." Third, the MSP provision must "invalidate, impair, or supersede" the RIIIFA provisions which purport to make the United States the "primary" insurer. See United States Dep't of ___ ______________________ the Treasury v. Fabe, 113 S. Ct. 2202, 2208 (1993); Villafane- _____________ ____ __________ Nerez v. FDIC, 75 F.3d 727, 735 (1st Cir. 1996). _____ ____ The district court ruled the McCarran-Ferguson Act inapplicable because the first precondition recited above was not met; that is, it found that the MSP provision does "specifically relat[e] to the business of insurance." See Barnett Bank of ___ ________________ Marion County v. Nelson, 1996 WL 130728, at *12 (U.S. Mar. 26, ______________ ______ 1996) (holding that a federal statute, 12 U.S.C. 92, which expressly permits national banks to sell insurance in small towns, is a statute which "specifically relates to the business of insurance," and preempts a state statute which prohibits banks from selling insurance). On appeal, the Fund argues that the MSP provision does not come within the definition of the term "business of insurance" set forth in United Labor Life Ins. Co. ___________________________ v. Pireno, 458 U.S. 119 (1982). The United States responds that ______ Pireno, a case decided under the second or "antitrust" clause of ______ ______  ____________________ man, Clayton, and FTC antitrust acts] shall be applica- ble to the business of insurance to the extent that such business is not regulated by State law. 15 U.S.C. 1012.  7 15 U.S.C. 1012(b), see supra note 2, is not applicable in the ___ _____ present case. Because we conclude that the MSP provision is a statute "specifically relating to the business of insurance," irrespective of any formal application of the Pireno test, see ______ ___ Pireno, 458 U.S. at 129 (noting that no one factor is disposi- ______ tive, and that the three-part standard contemplates a balancing test), we need not reach this issue. See Barnett Bank, 1996 WL ___ ____________ 130728, at *9 (citing Pireno as "context[]," but foregoing ______ extended three-factor analysis); Owensboro Nat'l Bank v. Steph- ____________________ ______ ens, 44 F.3d 388, 391 (6th Cir. 1994), petition for cert. filed, ___ ________ ___ _____ _____ 64 U.S.L.W. 3069 (U.S. July 13, 1995) (No. 95-74); infra note 5. _____ The relevant inquiry under the first clause of section 1012(b) of the McCarran-Ferguson Act focuses on two basic elements: "spe- cific relation" and "business of insurance." 1. "Specific Relation" 1. "Specific Relation" _________________ The import of the "specific relation" element is readily discernible from its pre-enactment history. Before 1944, the United States Supreme Court consistently had held that the Dormant Commerce Clause of the United States Constitution did not _______ invalidate state insurance laws which imposed impermissible burdens on interstate commerce. However, when first confronted with an affirmative congressional enactment purporting to regu- ___________ late the interstate business of insurance directly, the Court ruled that the business of insurance is part of "interstate commerce" and subject to regulation (hence, preemption) under 8 Congress's commerce-clause powers. See United States v. South- ___ ______________ ______ Eastern Underwriters Ass'n, 322 U.S. 533, 544 (1944).  __________________________ Congress promptly repudiated the holding in South- ______ Eastern Underwriters, by enacting the first clause of section _____________________ 1012(b), see supra note 2, which restored immunity from dormant ___ _____ commerce-clause challenges to State insurance laws. See Pruden- ___ _______ tial Ins. Co. v. Benjamin, 328 U.S. 408, 429-30 (1946); Silver v. _____________ ________ ______ Garcia, 760 F.2d 33, 36-37 (1st Cir. 1985). Congress went ______ further, however, by providing that even statutes enacted pursu- ant to Congress's commerce-clause powers, for general application to interstate commerce, would not preempt state insurance laws unless the federal statute expressly announced Congress's specif- ic intention to inject itself into the area of state insurance law. See Barnett Bank, 1996 WL 130728, at *10 ("[T]he [McCarran] ___ ____________ Act does not seek to insulate state insurance regulation from the reach of all federal law. Rather, it seeks to protect state regulation primarily against inadvertent federal intrusion -- say, through enactment of a federal statute that describes an affected activity in broad, general terms, of which the insurance business happens to comprise one part."). Thus, McCarran-Fer- guson Act 1012 imposes no substantive constraint on the con- gressional power to regulate insurance, but simply "creates `a form of inverse preemption, letting state law prevail over general federal rules those that do not "specifically relate[] to the business of insurance."'" Villafane-Nerez, 75 F.3d at 735 _______________ (quoting NAACP v. American Family Mut. Ins. Co., 978 F.2d 287, _____ ______________________________ 9 293 (7th Cir.1992), cert. denied, 113 S. Ct. 2335 (1993)). That _____ ______ is to say, section 1012 "`impos[es] what is, in effect, a clear-- statement rule.'" Id. (quoting Fabe, 113 S. Ct. at 2211); see ___ ____ ___ Barnett Bank, 1996 WL 130728, at *12 (rejecting argument that ____________ Fabe's "clear-statement" rule imposed any heightened requirement ____ that a federal statute referring to "insurance" must also "use the words 'state law is pre-empted,' or the like"). The parties dispute whether the Medicare program itself _______ specifically relates to insurance, since it was established long after the 1945 enactment of the McCarran-Ferguson Act, and, arguably at least, is not the typical insurer contemplated by section 1012 (i.e., a private insurance carrier). For example, the Fund points to the recent decision in Kachanis v. United ________ ______ States, 844 F. Supp. 877 (D.R.I. 1994), which held that a Federal ______ Employees' Compensation Act ("FECA") provision, which allows the United States to recover in subrogation from any "third party" liable to an injured employee, is not a statute "specifically relating to the business of insurance." Id. at 882 ("[W]hile ___ FECA does provide insurance-like benefits to employees, there is no specific mention of insurance in the statute."). However, unlike the plainly generic "third party" reference in FECA, connoting a regulation of general application which might encom- pass both insurers and non-insurers (e.g., tortfeasors), the MSP provision in the Medicare Act specifically adverts to "insur- ance," see 42 U.S.C. 1395y(b)(2)(A) (precluding Medicare ___ coverage if "payment has been made, or can reasonably be expected 10 to be made promptly . . . under . . . an automobile or liability insurance policy or plan") (emphasis added), as does its legisla- _________ tive history.3 Whether the Medicare program or any other govern-  ____________________ 3The House Report provides, in relevant part: Under Title VIII, Medicare will have residual rather than primary liability for the payment of services required by a beneficiary as a result of an injury or illness sustained in an auto accident where payment for the provi- sion of such services can also be made under an automobile insurance policy. Under this _________ ______ provision, it is expected that Medicare will ordinarily pay for the beneficiary's care in the usual manner and then seek reimbursement from the private insurance carrier after, and _________ _______ to the extent that, such carrier's liability under the private policy for the services has been determined. Under present law, Medicare is the primary payor (except where a work- men's compensation program is determined to be responsible for payment for needed medical services) for hospital and medical services received by beneficiaries. This is true even in cases in which a beneficiary's need for services is related to an injury or illness sustained in an auto accident and the servic- es could have been paid for by a private insurance carrier under the terms of an auto- _________ _______ _____ mobile insurance policy. As a result, Medi- ______ _________ ______ care has served to relieve private insurers _______ ________ of obligations to pay the costs of medical care in cases where there would otherwise be liability under the private insurance con- _______ _________ ____ tract. The original concerns that prompted _____ inclusion of this program policy in the law the administrative difficulties involved in ascertaining private insurance liability _______ _________ _________ and the attendant delays in payment no longer justify retaining the policy, particu- larly if it is understood that immediate payment may be made by Medicare with recovery attempts undertaken only subsequently when liability is established. In order to avoid excessive administrative costs and efforts in pursuing minor recoveries, the committee expects the Secretary of HHS to establish in regulations rules regarding the minimum 11 mental "insurer" technically is considered part of the "business of insurance" is not material. Barnett Bank, 1996 WL 130728, at ____________ *9 ("The word 'relates' is highly general, and this Court has interpreted it broadly in other pre-emption contexts."). Thus, for example, the Internal Revenue Service is not part of the "business of insurance," and yet we have held that a Treasury Regulation, which resulted in a tax on insurance companies, rendered the McCarran-Ferguson Act "inapplicable by its own terms." See Hanover Ins. Co. v. Commissioner, 598 F.2d 1211, ___ _________________ ____________ 1219 (1st Cir.), cert. denied, 444 U.S. 915 (1979); see also _____ ______ ___ ____ Texas Employers' Ins. Ass'n v. Jackson, 820 F.2d 1406, 1414-15 ____________________________ _______ (5th Cir. 1987), cert. denied, 490 U.S. 1035 (1989) (holding that _____ ______ the Longshore and Harbor Workers' Compensation Act specifically relates to "business of insurance"). Therefore we conclude that Congress expressly and deliberately injected itself into the area of state insurance law with its enactment of the MSP provision. See Barnett Bank, 1996 WL 130728, at *11 ("The language of the ___ _____________ Federal Statute before us is not general. It refers specifically to insurance. Its state regulatory implications are not surpris- ing, nor do we believe them inadvertent."). 2. "Business of Insurance" 2. "Business of Insurance" _____________________  ____________________ amounts estimated as recoverable and the procedures for seeking recovery from private _______ carriers. Such procedures are to be similar ________ to those currently employed by Medicare in seeking recovery in workmen's compensation cases.  H.R. Rep. No. 1167, 96th Cong., 2d Sess. 389, reprinted in 1980 _________ __ U.S.C.C.A.N. 5526 (emphasis added). 12 The second element that the federal statute actually pertain to activities that are part of the "business of insur- ance" is satisfied as well. The MSP provision regulates the core relationship between a private insurer and its insured. "`Statutes aimed at protecting or regulating th[e] relationship [between insurer and insured], directly or indirectly, are laws regulating the "business of insurance."'" Fabe, 113 S. Ct. at ____ 2208 (quoting SEC v. National Sec., Inc., 393 U.S. 453, 460 ___ ____________________ (1969)). The "core" matters encompassed within the term "busi- ness of insurance" may include "the type of [insurance] policy that could be issued, its reliability, interpretation, and enforcement," cf. id. at 2211,4 as well as the standards govern- ___ ___ ing performance under insurance contracts, cf. id. at 2212. See, ___ ___ ___ e.g., Barnett Bank, 1996 WL 130728, at *9 (noting that 12 U.S.C. ____ ____________ 12 "specifically relates to the business of insurance" because, inter alia, it "sets forth certain specific rules prohibiting _____ ____ banks from guaranteeing the 'payment of any premium on insurance policies issued through its agency'"). The MSP provision, and its implementing regulations, explicitly prohibit private insur- ers from negotiating or enforcing any insurance-contract term  ____________________ 4Fabe defines the activities encompassed within the term ____ "business of insurance," albeit in the process of applying the second prong of 1012(b), i.e., whether a state priority statute is a law enacted "for the purpose of regulating the business of insurance." Nonetheless, Fabe is apposite to the extent that ____ "business of insurance" is a term common to both the first and second prongs under 1012(b). See Atlantic Cleaners & Dyers v. ___ __________________________ United States, 286 U.S. 427, 433 (1932) (same word or phrase used _____________ repeatedly in statute is presumed to have same meaning); Fortin ______ v. Marshall, 608 F.2d 525, 528 (1st Cir. 1979).  ________ 13 which purports to make Medicare the primary-insurance obligor in lieu of a private insurance carrier, even though authorized by state law. See 42 C.F.R. 411.32(a) ("Medicare benefits are ___ secondary to benefits payable by a third party payer even if the ____ __ ___ State law or the third party payer states [otherwise].") (empha- _____ ___ ______ _________ sis added). This overt federal intervention directly control- ling the core contract relationship at both the negotiation and performance stages establishes that the MSP provision "spe- cifically relat[es] to the business of insurance," and fully explains the litany of unanimous decisions that reach the same conclusion many without extended analysis of the Pireno ______ factors.5 See Colonial Penn. Ins. Co. v. Heckler, 721 F.2d 431, ___ _______________________ _______  ____________________ 5The more specific challenges made by the Fund, based on the three-factor Pireno test, gain it nothing. First, the Fund ______ contends that the MSP provision does not involve a practice which has the effect of transferring or spreading a policyholders' risk, see Pireno, 458 U.S. at 129, because the MSP provision ___ ______ merely shifts risk between the Medicare program and the Fund, not between the insured and the Fund. We do not think Pireno is to _______ ______ be read so narrowly. It held only that purely peripheral insur- ance company activities, such as an insurer's use of a medical peer review committee to consider whether claimants' medical bills were "reasonable," are not part of the rough and tumble of risk allocation in insurance contracts. Id. at 130-31. A __ federal statute prohibiting a private insurer from imposing the primary insurance obligation on the Medicare program clearly and directly affects the allocation of risk to the policyholder, who is likely to have to pay higher premiums to offset the insurer's increased liability exposure. The same consideration attends to the second Pireno factor as well. Id. at 129 (second factor is ______ ___ "whether the [regulated] practice is an integral part of the policy relationship between the [private] insurer and the in- sured"). Finally, despite the MSP provision that the United States can pursue "any entity" for reimbursement, see id. (third ___ __ factor is "whether the [regulated] practice is limited to enti- ties within the insurance industry"), the MSP provision limits reimbursement to recoveries from "primary plans," whose defini- tion lists only entities which are clearly "within" the insurance industry. See 42 U.S.C. 1395y(b)(2)(A) ("primary plan" means ___ 14 442 n.6 (3d Cir. 1983); Varacalli v. State Farm Mut. Auto. Ins. _________ ___________________________ Co., 763 F. Supp. 205, 209 (E.D. Mich. 1990) (citing United ___ ______ States v. Blue Cross and Blue Shield of Michigan, 726 F. Supp. ______ ________________________________________ 1517, 1523 (E.D. Mich. 1989)); Abrams v. Heckler, 582 F. Supp. ______ _______ 1155, 1165 n.8 (S.D.N.Y. 1984). As the Medicare Secondary-Payer Statute is a federal statute "specifically relat[ing] to the business of insurance," the McCarran-Ferguson Act is inapplicable and the preemptive effect of the MSP provision upon the Rhode Island Insurers' Insolvency Fund Act therefore must be reviewed under conventional preemption principles. C. Conventional Preemption Analysis C. Conventional Preemption Analysis ________________________________ Notwithstanding the inapplicability of the McCarran- Ferguson Act, the Fund argues that the priority mandated by the MSP provision does not trump the RIIIFA, even under conventional preemption analysis, because the priority provisions in the two statutes are compatible. See Summit Inv. and Dev. Corp., 69 F.3d ___ __________________________ at 610. First, the Fund points out that the MSP provision permits the United States to seek reimbursement only if another insurer has made a payment to the Medicare beneficiary, or if such payment can "reasonably be expected to be made." Conse- quently, it argues, it would be unreasonable for any Medicare ____________ beneficiary to expect reimbursement from the Fund, because the  ____________________ "a group health plan or large group health plan, . . . a work- men's compensation law or plan, an automobile or liability insurance policy or plan . . . or no-fault insurance"); cf. ___ Kachanis, 844 F. Supp. 877 (D.R.I. 1994) (holding 1012 applica- ________ ble to FECA provision allowing United States to recover from any "third party").  15 RIIIFA exhaustion provision explicitly requires claimants to exhaust all governmental insurance before receiving Fund pay- ments. This argument altogether disregards the function of federal preemption, however, by implicitly assuming that the RIIIFA exhaustion provision continues in force notwithstanding the mutually inconsistent allocations of primary insurance liability as denoted in the MSP provision and the RIIIFA. Thus, the Fund's argument is fatally circular: the Medicare beneficiary could "reasonably expect" the Fund to take the primary insurance risk if and because the MSP provision preempts the Fund's exhaus- __ _______ tion provisions. Second, the Fund contends that it is not a "primary plan," as defined by the MSP provision, see 42 U.S.C.  ___ 1395y(b)(2)(B)(ii), (b)(3)(A) ("an automobile or liability insurance policy or plan"), because it is not the Medicare beneficiaries' private insurance carrier, but rather a non-profit governmental agency. The Fund further argues that it is not a "plan," as defined by Medicare regulations, because an insurance insolvency-guarantor statute like the RIIIFA is not an insurance "policy," and therefore is not an "arrangement, oral or written, by one or more entities, to provide health benefits or medical care or assume legal liability for injury of illness." 42 C.F.R. 411.21; see supra note 1. Neither contention is tenable.  ___ _____ The RIIIFA itself provides that, upon a declaration of insolvency, the Fund is "deemed the insurer to the extent of the ______ obligations [under the policy] on the covered claims," see R. I. ___ 16 Gen. Laws 27-34-8(a)(2) (emphasis added), subject solely to specified limitations on the amount of coverage. Thus, the Fund is deemed the private insurer, and hence a "primary plan" under the MSP provision and its regulations.6  III III CONCLUSION CONCLUSION __________ For the foregoing reasons, the district court judgment ___ ________ _____ ________ is affirmed, with costs to plaintiff-appellee. __ ________ ____ _____ __ __________________  ____________________ 6Finally, the Fund raises a puzzling challenge to the implicit district court ruling that RIIIFA's preempted provisions are severable from its non-preempted provisions. It argues that no part of RIIIFA can be struck down because the Rhode Island Legislature envisioned the Fund only as a "last resort" for insolvent insurers' policyholders, and that it would not have enacted RIIIFA at all had it known that its core "covered claim" definition was going to be so severely restricted with respect to Medicare benefits. Aside from its conjectural nature, this contention seems counterproductive from the Fund's standpoint. If the preempted RIIIFA provision is not severable, of course, the proper relief is not, as the Fund apparently assumes, a holding that the entire RIIIFA stands as enacted, but the invali- _______ dation of the entire RIIIFA, which would result in appellant's ______ ______ extinction. See, e.g., Hooper v. Bernalillo County Assessor, 472 ___ ____ ______ __________________________ U.S. 612, 624 (1985). Beyond this, no more need be said, howev- er, as any nonseverability decision is for the Rhode Island ___ courts. See Zobel v. Williams, 457 U.S. 55, 65 (1982) (striking ___ _____ ________ down portion of state statute, but leaving ultimate issue of nonseverability for state-court resolution). ___ 17